[Civ. No. 29866. First Dist., Div. Two. Mar. 20, 1973.]

MARY ANN CHAPIN et al., Plaintiffs and Appellants, v. FAIRCHILD CAMERA AND INSTRUMENT CORPORATION, Defendant and Respondent.

**COUNSEL**

Schiller & Rose, Philip L. Grauman and M. Fred Rose for Plaintiffs and Appellants.

Danaher, Gunn & Klynn and Michael Klynn for Defendant and Respondent.

## OPINION

**TAYLOR, P. J.**—This appeal by certain former salaried and hourly employees (Employees) of the Memory Products Department (Memory Products) of respondent, Fairchild Camera and Instrument Corporation (Fairchild), from an adverse judgment after a court trial, presents a question of first impression in this state as to the nature of severance and in lieu of notice benefits[1] in a contract of employment. For the reasons set forth below, we have concluded that the trial court erred in concluding that Fairchild's sale of Memory Products was not a termination of employment that would entitle the Employees to the benefits in issue.

The record reveals the following pertinent facts: Fairchild, the parent foreign corporation with several subsidiaries and 13 different divisions in 50 states, created Memory Products in November 1965, as a separate department to produce memory cores for small computers. Fairchild's Semiconductor Division (Semiconductor), under contract, performed personnel and payroll functions, as Semiconductor did for all Fairchild west coast personnel. The Employees were thus subject to the corporate standard practice instructions (SPIs) issued by Fairchild's home office and the divisional instructions locally issued by Semiconductor. The SPIs and divisional instructions were kept in loose leaf binders and available to all personnel who wanted to look at them; these binders were about two inches thick and contained several hundred pages.

Prior to May 1965, a time when about six of the Employees were employed by Semiconductor, Fairchild's SPI 706 (which applied only to salaried Employees), provided, so far as pertinent, that salaried personnel were entitled to "separation allowances" of one week's pay for up to one year's service, and two weeks' pay for over one year to 10 years of service.[2] 706 also provided that severance pay was "intended to cover the readjustment period required by the employee to obtain another position."

Semiconductor's divisional instructions 710 and 713, respectively, so far as pertinent, defined "layoffs" as the involuntary termination of employ-

---

[1]Under the terms of the employment here in issue, the salaried Employees were entitled to "severance pay" benefits, and the hourly Emplyees to "in lieu of notice pay" benefits. Thus, the terms are interchangeable (cf. *Straus-Duparquet, Inc.* v. *Local U. No. 3 Int. Bro. of Elec. Wkrs.* (2d Cir. 1967) 386 F.2d 649).

[2]On May 19, 1965, after *Willets* v. *Emhart Manufacturing Company* (1965) 152 Conn. 487 [208 A.2d 546], 706 was amended to provide that employees terminated by the sale of a Fairchild facility would not be eligible for a separation allowance. However, the court below found that the employees who so testified did not have notice of this amendment and could make no findings as to the others; and did not base its decision on the provisions of 706.

ment due to lack of work, and provided that on layoff: 1) hourly Employees were entitled to one week's notice or one week's pay in lieu thereof ("in lieu of notice pay"); and 2) salaried Employees were entitled to one week's severance pay, for service up to one year, and two weeks' severance pay for service of more than one year. While neither 706 nor 710 and 713 were concealed from the Employees, those who testified had no knowledge of 706, but had knowledge of 710 and 713.

In January 1968, Fairchild began negotiations with Core Memories, Inc. (Core) for the sale of Memory Products. At meetings held during the second week of February, the Employees were informed by a Fairchild executive, Dr. Noyce, that a sale was pending but were not told of the exact date. The Employees were also informed that Core wanted to purchase Memory Products as a continuing business and wanted to retain all personnel, in identical jobs with continuing seniority rights and similar but not identical fringe benefits.[3] The contract of sale was signed on Friday, March 1, 1968, at which time Core agreed to continue the same rate of pay and seniority rights of Memory Products' Employees and similar fringe benefits; the agreement did not contain any sum for severance pay. The contract was executed on Saturday, March 2, 1968, and on Monday, March 4, 1968, Core took over the operation of Memory Products. All but one of the Employees transferred to Core; in April of 1968, Core terminated 40 of the 187-191 Employees; within three months of the sale date, Core terminated another 50-55. Core paid severance or in lieu of notice pay to some of the discharged Employees. These payments, however, were not equal to the amounts that would have been payable to them pursuant to divisional instruction 713, and, in some instances, were made purely at the discretion of Core's management.

Employee, Mary Ann Chapin, filed a complaint with the labor commissioner and subsequently in the small claims court for severance benefits under her contract of employment with Fairchild. By stipulation, Fairchild's appeal from the municipal court action was dropped on filing of the instant class action in the superior court.

The trial court found that this was a valid class action pursuant to Code of Civil Procedure section 382, but that the Employees were not entitled to damages or benefits. The trial court based its conclusion on the following premises: Employees had the option at the time of sale of obtaining

---

[3]For example, for salaried Employees with service of more than one year, Core provided one week of severance pay, in contrast to Fairchild's two weeks of severance pay. The vacation and insurance benefits also differed.

severance pay from Fairchild if they did not wish to become employed by Core. When the sale was consummated, Employees were in fact offered jobs by Core that resulted in their receiving full seniority rights and substantially equal fringe benefits from Core. The acceptance of employment with Core by Employees was done with full knowledge and intention, freely and willingly, and constituted an acceptance of Core's employment terms, a waiver of any rights pursuant to their employment agreement with Fairchild and further constituted a novation and substitution of Core's terms of employment for Fairchild. The transfer of employment from Fairchild to Core did not constitute a layoff within divisional instruction 713. At least two weeks prior to the sale of Memory Products, the Employees were told at a meeting by a vice president of Fairchild and a representative of Core about the intended sale and the opportunity to become employed by Core. This meeting constituted notice within divisional instruction 713 and gave the Employees a reasonable choice concerning their future employment.

At the outset, we note that the trial court's conclusion was based on a legal theory of novation that was neither pleaded, proved nor urged by either party,[4] and reversal would be required on this ground alone. Novation must be specifically pleaded (*Alexander* v. *Angel,* 37 Cal.2d 856 [236 P.2d 561]). In addition, the findings that the February meetings constituted proper notice to the hourly Employees[5] and that SPI 706 became a part of the Employees' contract of employment[6] are not supported by the record.

---

[4]The record indicates that novation was first mentioned negatively by the Employees' counsel in his closing argument to the trial court. Fairchild's counsel stated that the "suggestion that this is a situation of novation is absurd. It is not a novation situation." Although the trial court indicated that it would permit an amendment of the pleadings, no motion to amend was ever made.

[5]The uncontroverted evidence indicates that the Employees were told that the sale was imminent, but were not given a specific date. On the afternoon of Friday, March 1, the badges of the Employees were first collected and then returned as the sale was in doubt. None of the Employees received written notice of the termination of their employment with Fairchild, and apparently were not aware that Core had, in fact, taken over, until Monday, March 4.

[6]The Employees were informed of the substance of 710 and 713; there was conflicting evidence as to whether 713 had been posted. The uncontroverted evidence indicates that neither 706 (either in its revised or original form), nor its content, was ever communicated to the Employees. Fairchild's policy was that SPIs were distributed in binders to executives and available for inspection by other personnel. Ms. Chapin, as executive secretary to the general manager of Memory Products, was in charge of keeping the binders up to date and answering questions of Memory Products personnel about their contents but had never seen or heard of 706. At the hearing before the labor commissioner and in the small claims court, Fairchild's witnesses indicated that 706 had never been circulated as it was only an inter-office memo.

While the interpretation of severance and in lieu of notice benefits[7] in a contract of employment has not previously been presented to an appellate tribunal of this state, there are numerous decisions in other jurisdictions (see 147 A.L.R. 151; 40 A.L.R.2d 1044). ■ As Fairchild relies *on the absence of* a statutory requirement and/or a collective bargaining agreement, we are constrained to point out, preliminarily, that termination pay provisions are identically construed whether contained in formal written agreements, such as collective bargaining agreements (*Adams* v. *Jersey Central Power & Light Company* (1956) 21 N.J. 8 [120 A.2d 737]), or a corporate personnel policy that becomes a part of the understood employment agreement (*Willets* v. *Emhart Manufacturing Company, supra; Mace* v. *Conde Nast Publications, Inc.* (1967) 155 Conn. 680 [237 A.2d 360]), or pursuant to a statute (*Bolta Products Div.* v. *Director of Div. of Emp. Sec.* (1970) 356 Mass. 684 [255 N.E.2d 357]).

■ The record here establishes: 1) the existence of an understanding of employment between the Employees and Fairchild prior to the sale of Memory Products; 2) pursuant to Fairchild's employment policies, salaried personnel were entitled to one or two weeks of severance pay, depending on length of service, and hourly personnel to one week's notice, or one week's pay in lieu thereof, as set forth in Semiconductor's divisional instruction 713; 3) the interpretation of separation allowances as unemployment compensation in original SPI 706 and the subsequent exclusion of separation allowances on the sale of a facility in revised SPI 706 were never communicated to any of the Employees; 4) the termination benefits provided by Core to the Employees were not equal to those previously available from Fairchild; and 5) Fairchild's agreement with Core for the sale of Memory Products as a going concern, including all personnel, did not contain a sum for the separation benefits here in issue.

Here, as in *Willets* v. *Emhart Manufacturing Company, supra,* the underlying question is whether the sale of Memory Products was a layoff for lack of work within the language of 713. There can be no question that here, as in *Willets,* the sale involved a permanent release of the Employees

---

[7]Fairchild argues that public policy supports its position and cites the following from Commerce Clearing House Wage and Hour Reporter, PL 25.580.55: "severance pay is not pay for time worked; just the reverse is true—it depends upon the employee not working at the time he receives it." The language is quoted out of context from an illustration indicating that under the Fair Labor Standards Act, an employer is not allowed to credit severance pay against regular or overtime wages due to an employee, so that on termination, an employee is entitled to both. This is also the law in this state (*Powell* v. *California Dept. of Employment,* 63 Cal.2d 103 [45 Cal.Rptr. 136, 403 P.2d 392]), but does not support Fairchild's argument or resolve the issues here presented.

by Fairchild. By that sale, Fairchild made certain that it could no longer fulfill its part of the employment relationship (*Matthews* v. *Minnesota Tribune Co.* (1943) 215 Minn. 369 [10 N.W.2d 230, 147 A.L.R. 147]). Nor can it be argued that this release is not a layoff because it is permanent and not temporary in duration. Divisional instruction 713 defines a layoff as involuntary termination due to lack of work, consistent with the dictionary and accepted definition of a layoff as a cessation of employment because of a slack in production and without prejudice.[8] The fact that a layoff is often temporary does not require that it must be (see *International Ass'n of Machinists* v. *State* (1943) 153 Fla. 672 [15 So.2d 485]).

Certainly, Fairchild's sale of Memory Products was a permanent layoff of the Employees. Fairchild's admitted modification of 706 after the 1965 decision in *Willets* v. *Emhart, supra,* (discussed in fn. 2 above), indicates that its own interpretation of its own personnel policies prior to the 1965 amendment and those of its Semiconductor division, as set forth in 710 and 713, was that separation benefits would be payable on the sale of a facility or division.

The trial court and Fairchild make much of the fact that the Employees suffered little, if any, immediate economic loss, as they remained in continuous employment with their seniority rights and at the same rate of pay with Memory Products. An identical argument was rejected in *Willets, supra,* at page 548: "The defendant makes much of the fact that the plaintiffs have suffered little, if any, immediate economic loss. It argues that the principal difference is not in the work or pay of the plaintiffs but in the ownership of the employer's business. This argument involves the proposition that events occurring subsequent to the layoff are the important factors in the determination whether the plaintiffs are entitled to separation pay. This is not true. ■ As was pointed out in Adams v. Jersey Central Power & Light Company, 36 N.J.Super. 53, 71, 114 A.2d 776, aff'd, 21 N.J. 8, 120 A.2d 737, unemployment is not a prerequisite to the right to separation pay which may, and frequently does, exist where there is no interruption whatever in the continuity of employment. Separation pay is not analogous to, nor is it a form of, unemployment compensation. Rather, it is a kind of accumulated compensation for past services and a material recognition of their past value. [Citation.] It concerns the past, not the future, and once it is earned, it becomes payable no matter what may there-

[8]Webster's New Collegiate Dictionary (2d ed.) page 477, states: "Layoff. The act of laying off, esp. work or workmen; a period of being laid off work; a shutdown."

after happen. For various applications of this rule, see the cases set forth in the annotations in 147 A.L.R. 151 and 40 A.L.R.2d 1044."

Fairchild attempts to distinguish *Willets* on the ground that in that case the court was concerned with equitably compensating personnel who had to move from Connecticut to Louisiana, to continue their employment with the purchaser. The theory of *Willets,* quoted above, indicates that this is not a proper basis of distinction. *Willets* was followed in *Mace* v. *Conde Nast Publications, Inc., supra,* and *Straus-Duparquet, Inc., supra.*

 Here, as in *Adams* v. *Jersey Central Power & Light Company, supra,* 120 A.2d 737, 741, the fact remains that the employment with the seller was terminated; the Employees were hired by Core under substantially different terms[9] that not only did not provide severance pay of the same duration as Fairchild, but also did not undertake to discharge Fairchild's obligation of severance pay to the Employees. Thus, it cannot be said that the termination of their employment by Fairchild was voluntary on the part of the Employees. We are not concerned with the new jobs but the old ones. The termination was entirely involuntary on the part of the Employees. Fairchild sold Memory Products, that part of its business in which the Employees were engaged, and by its voluntary act made it wholly impossible for the Employees to continue their employment with Fairchild.

As indicated above, the trial court determined the issues on the basis of novation. Even assuming the issue had been properly pleaded, it would not be possible here as there was no consideration (*Ybarra* v. *Solarz,* 56 Cal. App.2d 342, 346 [132 P.2d 880]).[10] Nor could there be a novation without the consent of the Employees. Thus, Fairchild's reliance on *Armstrong* v. *Cherry,* 89 Cal.App. 442 [264 P. 798]. is inapposite.[11] We note that an

___

[9]Apart from the differences in fringe benefits previously mentioned, Fairchild had a reputation in the industry that included the fact that there had never been a layoff.

[10]*Chinn* v. *China Nat. Aviation Corp.,* 138 Cal.App.2d 98 [291 P.2d 91], is also pertinent as there the employee (who had previously announced his intention to resign), remained on the job after the employer enacted regulations providing for severance pay. In holding that the employee had stated a cause of action for severance benefits, this court (division one), quoting from *Vogel* v. *Bankers Bldg. Corp.,* 112 Cal.App.2d 160, 169 [245 P.2d 1069], said at page 103: " 'A single consideration may support the several counterpromises made by the other party to the transaction.' Thirdly, it should be remembered that plaintiff did not terminate the employment. It was terminated by the employer, so that the question of what the employee's rights might have been had he left the employment a moment after the regulations were announced is academic. While, of course, there was nothing in the regulations that guaranteed the employee continued employment, and therefore the employer could terminate the employment at any time, the regulations stated the obligation of the employer upon such termination."

[11]In fact, in *Armstrong* v. *Cherry, supra,* although the employee was denied damages because he knew of and acquiesced in the new conditions of employment, this

employer's identical contention based on novation was carefully analyzed and rejected by the court in *Mace* v. *Conde Nast Publications, Inc., supra,* at page 363, as follows: "The plaintiffs knew nothing of the agreement between the defendant and Butterick until after it was signed. The plaintiffs went to work for Butterick because they were automatically transferred there by the defendant without being requested to transfer there and without either an oral or a written agreement by them to such a transfer.

"There can be no question that, as a result of the licensing agreement with Butterick, the defendant permanently terminated its employer-employee relationship with the plaintiffs and, at the same time, effected a reduction in its staff. That termination, without more, served to entitle the plaintiffs to severance pay under the terms of their employment contract. [Citation.] The defendant sought to escape this result by providing that the circumstances established a novation by indicating that the plaintiffs had, by their actions, expressed acceptance of Butterick in lieu of the defendant as the company to which they would look for severance payments. 'Novation' is a term usually used to refer to instances in which a new party is introduced into a new contract. [Citation.] It requires proof that the one in the position of creditor, in this case the plaintiffs, had accepted a new debtor, in this case Butterick, in the place of the defendant to which they would look for fulfilment of the severance pay obligation owing to them. [Citation.] In addition, it requires proof that the plaintiffs had agreed to a discharge of the defendant's obligation to them. [Citation.]"

Fairchild's public policy argument concerning the initiation of business sales and mergers is likewise without merit. The many cases in other jurisdictions, discussed above, do not suggest that the sale of businesses has been inhibited by the holdings of the cases cited. We may take judicial notice of the many corporate sales, mergers and reorganizations that have taken place in recent years and venture to suggest that these are not related to severance pay provisions. Fairchild is not prohibited from further sales, only from sales that do not take into account its pre-existing contract obligations to Employees that are sold as part of the on-going business. Fairchild can

court (division one) said at page 444: "It is a rule universally recognized, that while a master may not close out his business without becoming liable in damages to an employee under a contract of employment for a specific term, still an immaterial change gives no cause of action for damages where there is otherwise no change in the manner of conducting the business and the employer continues in a way to be the real owner. (39 Cor.Jur. 76.) See, also, *Levy* v. *Friedlander,* 24 La. Ann. 439."

easily protect itself by informing its personnel that certain benefits do not accrue or are not payable in cases of sale or merger.

The judgment is reversed and the case remanded to the trial court for an assessment of the precise damages sustained by each of the Employees.

Kane, J., and Rouse, J., concurred.

A petition for a rehearing was denied April 19, 1973, and respondent's petition for a hearing by the Supreme Court was denied May 16, 1973.