Douglas J. LIVERNOIS, Appellee,

v.

WARNER–LAMBERT COMPANY, INC., a Corporation, Appellant.

Ronald D. DUCHENE, Appellee,

v.

WARNER–LAMBERT COMPANY, INC., a corporation, Appellant.

Ivan H. CHRISTOPHERSON, Appellee,

v.

WARNER–LAMBERT COMPANY, INC., a corporation, Appellant.

Thomas H. GIVENS, Appellee,

v.

WARNER–LAMBERT COMPANY, INC., a corporation, Appellant.

Urban G. MITCHELL, Appellee,

v.

WARNER–LAMBERT COMPANY, INC., a corporation, Appellant.

Thomas J. McHUGH, Jr., Appellee,

v.

WARNER–LAMBERT COMPANY, INC., a corporation, Appellant.

A.R. TRAUTWEIN, Appellee,

v.

WARNER–LAMBERT COMPANY, INC., a corporation, Appellant.

John J. CAPUTO, Appellee,

v.

WARNER–LAMBERT COMPANY, INC., a corporation, Appellant.

Clayton E. ROBINSON, Jr., Appellee,

v.

WARNER–LAMBERT COMPANY, INC., a corporation, Appellant.

Virginia M. SEJMAN, Appellee,

v.

WARNER–LAMBERT COMPANY, INC., a corporation, Appellant.

---

Douglas A. DODDS, Appellee,

v.

**WARNER–LAMBERT COMPANY, INC.,
a corporation, Appellant.**

**Nos. 83–1257 to 83–1267.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 1, 1983.

Decided Dec. 21, 1983.

Stanley Godofsky, New York City (Rex W. Mixon, Jr., Rogers & Wells, New York City, O.W. Bannister, Jr., Hill, Wyatt & Bannister, Greenville, S.C., on brief), for appellant.

C. Rauch Wise, Greenwood, S.C. (Wise & Tunstall, Greenwood, S.C., on brief), for appellees.

Before RUSSELL, HALL and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Cases sometimes amble down the judicial path which test the normal rules of adjudication. This is one.

Eleven plaintiffs in a diversity case disposed of by court trial have each won judgments against the defendant, Warner-Lambert Company, Inc. for severance pay (the individual recoveries ranging from a high of $58,625.98 to a low of $23,796.40) on the grounds that their jobs with Warner-Lambert at a facility in Greenwood, South Carolina had been terminated by the employer. Each of the plaintiffs has continued to work at the same facility, performing the same or similar tasks at comparable rates of compensation and other employee benefits. However, by reason of a sale, effective January 20, 1982, of Warner-Lambert's Medical Surgical Division as a going concern, the employer has changed to the purchaser of the business, Professional Medical Products, Inc.

Warner-Lambert, since 1957, had maintained a severance policy applicable to each of its employees meeting certain conditions as to length of service and age, if the employee were terminated by Warner-Lambert. The payment of severance benefits has not taken place under the severance policy in cases where an employee, himself or herself, caused termination of the employment relationship. The policy has provided that "an employee terminated by the Company, as a result of job elimination, work performance, or other reasons of Company convenience" would be entitled to severance pay.[1]

---

1. There was an expressed exception for a termination due to violation of Company rules or regulations. But that provision has no applicability to the problem with which we must wres-

On November 13, 1970, Warner-Lambert merged with Parke-Davis & Company, Inc. As part of the arrangements, Warner-Lambert, as the continuing corporation, was obligated to assure benefits given by Parke-Davis to its employees, and, in that connection, to compute the benefits on the basis of the original date of employment by Parke-Davis of the employee involved. Those benefits included rights under a Parke-Davis severance policy.

Because of Federal Trade Commission efforts to thwart the merger between Warner-Lambert and Parke-Davis, or, more precisely, to force its unraveling, Parke-Davis was operated as a separate and distinct Medical-Surgical Division. In the end, in October 1976, the FTC approved the merger, and, thereupon, Warner-Lambert extended to the employees of the Medical-Surgical Division the benefits of its severance policy. Each of the eleven plaintiffs had become, as of no later than January 1, 1969, a regular salaried employee of Parke-Davis. Benefits, under the Warner-Lambert severance policy, were to be calculated on the basis of their respective starting dates of employment with Parke-Davis regardless of whether, in any case, such starting date antedated the November 13, 1970 merger of Parke-Davis into Warner-Lambert, or, *a fortiori,* the October 1976 approval thereof by the FTC.

In or about 1980, Warner-Lambert began efforts to divest itself of its Medical-Surgical Division. On April 15, 1981, the divestiture plan was accorded wide publicity through issuance by Warner-Lambert of a press release. To three employees, Douglas J. Livernois, Douglas A. Dodds and John J. Caputo, all plaintiffs here, it offered individual employment continuation agreements to induce their remaining as employees of the Medical-Surgical Division while a search for a purchaser proceeded. The three substantially identical agreements, all dated as of May 8, 1981, called for Warner-Lambert to use reasonable efforts to insure continued employment of the three employees by the purchaser of the Medical-Surgical Division. In the event the efforts of Warner-Lambert to secure continued employment for any of the three employees were unsuccessful, the three agreements recognized that the severance policy would operate and result in cash payment to those of the three employees not offered by the purchaser continued employment at current salary plus the bonus for 1980.

As things in fact developed, the package of current salary plus 1980 bonus was made available to each of the three by the purchaser who was ultimately located. As a consequence, provisions in the May 8, 1981 agreements came into effect providing that, in the event of termination of employment of any of the three within one year from the date of divestiture of the Medical-Surgical Division, Warner-Lambert would pay the equivalent of severance pay earned at Warner-Lambert (or Parke-Davis) less the severance pay, if any, paid by the purchaser.[2]

The purchaser was Professional Medical Products, Inc., an entity independent and distinct from Warner-Lambert, formed on December 29, 1981. It acquired, effective January 20, 1982, the Warner-Lambert Medical-Surgical Division. The other eight plaintiffs had entered no contracts, like or unlike those between Livernois, Dodds and Caputo and Warner-Lambert. However, each of the eight enjoyed continued employment by PMP at current salary, plus 1980 bonus.

tle. No such violations of Company rules or regulations are asserted to have occurred.

2. While, in view of our determination respecting the rights as between the parties where no contracts similar to those of May 8, 1981 were entered between employer and employee, it becomes unnecessary to decide the question, it seems entirely probable that the three May 8, 1981 agreements would be interpreted as contractually superceding in nature, foreclosing any argument by Livernois, Dodds or Caputo that a job termination triggering the Warner-Lambert severance policy provisions came into effect on January 21, 1982 in their cases. The May 8, 1981 agreements appear to be fundamentally inconsistent with any such contention on behalf of Livernois, Dodds or Caputo.

Warner-Lambert and PMP contracted that the other benefits, *e.g.*, retirement plan entitlements for the employees in general and the eight and the three who are plaintiffs here in particular, would be comparable[3] to those enjoyed by them as Warner-Lambert employees prior to January 21, 1982.[4] That agreement explicitly applied only to Warner-Lambert and PMP, expressly denying third-party beneficiary status for anyone, including employees.

Warner-Lambert, by the agreement with PMP, obtained assurances that all employees transferred from the Warner-Lambert payroll to the PMP payroll as a consequence of the acquisition would become entitled to severance pay and other benefits on a comparable basis, with computations based on dates of original employment calculated by counting for such purposes service for Parke-Davis or Warner-Lambert.[5]

By letter of November 10, 1981, counsel for seven of the plaintiffs had notified Warner-Lambert of their anticipated claim to severance pay on the grounds that "the divestiture of the Medical Surgical Division [would be] for reason of Company convenience." While the subject of divestiture was in the air, no agreement had, as yet, been entered, and, although Warner-Lambert, in a letter of November 25, 1981, made clear its disagreement with the interpretation advanced on the employees' behalf, it also indicated a belief that the claim was premature.

Another letter, also dated November 10, 1981, and from the same source, expressed the position taken by the three employees who had signed the May 8, 1981 agreements. The letter did not contain an explicit claim, upon divestiture, for severance pay; nevertheless it indicated that they were concerned about their situations, and the possibility that claims by them for severance pay would eventuate should have been evident to Warner-Lambert.

The indicated disagreement was not subsequently cleared up, however, and the parties, unwilling or unable to work out a reasonable and equitable solution, have turned to what is all too often the solution of first resort, the Courts, rather than making a very determined effort to find through negotiation a fair and equitable solution along the lines which Warner-Lambert followed obviously with equity and fairness in mind, though its approach may not by any means have been perfect in that respect, or lacking in self-interest.

There is no dearth of cases dealing with similar situations arising upon spin-offs of going businesses and continued operation by the purchaser with employees formerly engaged by the concern which has divested itself of the business. We have not been referred to, nor have we located any South Carolina authority of particular pertinence. However, the question being, in each case, one of contract interpretation, and the variation of language spelling out the particular circumstances in which a right to severance pay will arise approaching the infinite,

---

**3.** Disregarding technicalities which need not be elaborated here, "comparable" meant "at least equal".

**4.** The agreement provided: "The Buyer hereby agrees to offer comparable (in terms of position, compensation (i.e., salary and bonus) and benefits) employment to all employees of the Division . . . ."

**5.** Some needless energy has been expended in jousting over whether Warner-Lambert was displaying the traits of a benevolent and enlightened employer or had solely selfish personal aggrandizement in mind. Of course, smoothing the way of employees by actively securing for them continued employment without diminution of benefits was a commendable step on Warner-Lambert's part. At the same

time, the purchase price for the Medical-Surgical Division was probably enhanced by a step designed to reassure the purchaser that the change of ownership would be accomplished with a minimum of interruption of continuity or dislocation of production. "It is a matter of common knowledge that the most valuable attraction a manufacturing plant can offer a prospective purchaser is a well-trained, efficient, loyal and contented group of employees." *Dulany Foods Inc. v. Ayers,* 220 Va. 502, 508, 260 S.E.2d 196, 200 (1979).

In short, what Warner-Lambert did was good for everyone concerned, itself included. Judgmental considerations of "good" or "bad" simply are not appropriate.

the cases provide at most very general guidance. In the end, each decision is essentially *sui generis*. That being so, we proceed, as we are satisfied that a South Carolina court would, to consideration of the contract question uniquely presented to ascertain the meaning of the parties. To the extent that a case might be helpful for that purpose, whether the court is a South Carolina one or not should matter very little. The same would hold true if, for some reason, the Warner-Lambert severance policy should be interpreted under the law of some other state.

Here the operative language to describe the event triggering a right to severance pay is termination of employment either as a result of job elimination or by reason of Company convenience. It first becomes necessary to discard as inapplicable cases where the nature of employment by the successor company, in terms of salary and other benefits, is markedly different and less favorable, from the employees' point of view, than that in force when the predecessor was the employer, so that same job continuance, the essential opposite of job elimination, simply cannot have been present. *Chapin v. Fairchild Camera Instrument Corp.*, 31 Cal.App.3d 192, 197, 107 Cal.Rptr. 111, 115 (1973) ("... the termina-tion benefits provided by Core to the Employees were not equal to those previously available from Fairchild."); *Adams v. Jersey Central Power & Light Co.*, 36 N.J.Super. 53, 71, 114 A.2d 776, 787 (1955), *affirmed*, 21 N.J. 8, 12, 120 A.2d 737, 741 (1956) ("Indeed the record is barren of any obligation by [the successor], even to [the predecessor] to pay severance pay to the latter's former employees") ("... hiring ... was substantially under different terms which not only did not provide severance pay of the same quality but did not undertake to discharge [the predecessor's] obligation of severance pay to the plaintiffs."); *Anthony v. Jersey Central Power & Light Co.*, 51 N.J.Super. 139, 143 A.2d 762 (1958); *cf. Hinkeldey v. Cities Service Oil Co.*, 470 S.W.2d 494 (Mo.1971); *Willets v. Emhart Manufacturing Co.*, 152 Conn. 487, 489, 208 A.2d 546, 547 (1965) ("All of them [the plaintiffs] lost their seniority rights with the defendant"); *Matthews v. Minnesota Tribune Co.*, 215 Minn. 369, 10 N.W.2d 230 (1943); *Mace v. Conde Nast Publications, Inc.*, 155 Conn. 680, 237 A.2d 360 (1967); *Hercules Powder Co. v. Brookfield*, 189 Va. 531, 540, 53 S.E.2d 804, 808 (1949) ("In his new employment with the Engineer Corps his duties were somewhat different and his pay less.").[6]

**6.** Cases appearing to go the other way are not particularly helpful either. Thus, *Younger v. Thomas International Corp.*, 275 Ark. 327, 330, 629 S.W.2d 294, 296 (1982) held that a job termination had not occurred where "approximately the same benefits were eventually adopted [by the successor] and made retroactive to the date of the transfer." However, under the severance policy of the predecessor company there in force, an offer of "an equivalent job opportunity" specifically precluded receipt of severance pay. A termination allowance was defined in the predecessor's policy as provision of financial assistance for a short period of time to allow for readjustment for salaried employees who are terminated through no fault of their own." The language of the Warner-Lambert severance policy does not contain similar provisions and we shall have to decide whether the distinction is with or without a difference.

*Compare Dhayer v. Weirton Steel Division of National Steel Corp.*, 571 F.Supp. 316 (N.D.W. Va.1983), currently on appeal, No. 83–2004 (4th Cir., Oct. 24, 1983). We normally are reluctant to cite a case which the Court will have to consider, since we might appear to be prejudging the outcome. However, regardless of the fate of that appeal, the case provides little in the way of authority here, for "continuous employment" was the test under the predecessor's severance policy there being defined and termination of employment by the company clearly was used in the limited sense of connoting the opposite of "continuous employment". While those accepting comparable jobs with PMP have remained continuously employed, those words do not appear in the Warner-Lambert severance policy, so termination of employment, especially through job elimination may have a quite different meaning from that assigned to employment termination in *Dhayer*.

Similarly, cases arising under ERISA (the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.*), while favorable in their outcome to Warner-Lambert, are not particularly pertinent, since they have been decided, not on contract grounds, but on a basis, under preempting federal law, of whether denial of severance pay under a policy, program or plan

Here, in marked contrast, save in one possible respect, the job held at Warner-Lambert remained in all material respects substantially the same for each employee who continued with PMP. Except for that possible distinction there simply has been no elimination of the job. Whether a termination of employment for reasons of company convenience occurred remains to be investigated.

■ Nevertheless, the fact that salary and other benefits under the employment by PMP were "at least equal to" or "as good as" those at Warner-Lambert does not serve to resolve the case. It eliminates, it is true, a frequently relied on factor for a conclusion that severance pay was due. But that alone is not sufficient to establish that there was no job termination. A substantial obstacle still remains. The trouble with what Warner-Lambert did, leaving aside for the moment the treatment of Livernois, Dodds and Caputo, and concentrating on the other eight plaintiffs, was that it appeared to compel the employees to accept, in place of Warner-Lambert, a new, and possibly untested employer, without the same assurances of a stable and continued future. Warner-Lambert has unwaveringly insisted, up until the time of oral argument, that what it had unilaterally arranged, without consultation, far less agreement, of the eight employees, served to transfer to PMP, and fully to eliminate, any continuing responsibility of Warner-Lambert to the employees. The ground advanced has been that the employees accepted continued employment with PMP, with similar liability assumed by PMP, as to amount and conditions of entitlement as, prior to January 21, 1982, Warner-Lambert had owed to them. However, one may not accomplish a novation without negotiating a common understanding with the other party or parties to an arrangement. *Dahl v. Brunswick Corp.,* 277 Md. 471, 483–85, 356 A.2d 221, 227–29 (1976).[7] The eight employees could not, simply as a matter of fiat, be forced to give up their rights under the severance policy in the event of job elimination at Warner-Lambert or termination of employment for other reasons of Company convenience. "Just as good" is generally discredited as an advertising slogan. It also is insufficient to allow unapproved substitution of the obligation of B (here PMP) for the obligation of A (here Warner-Lambert). *Mace v. Conde Nast Publications, Inc.,* 155 Conn. 680, 688, 237 A.2d 360, 363 (1967) (Novation "requires proof that the one in the position of creditor, in this case the plaintiffs, had accepted a new debtor ... in the place of the defendant to which they would look for fulfilment of the severance pay obligation owing to them.")[8]

calling for it where there occurs divestiture and continuation of employment in (or immediate reemployment by) the successor is arbitrary, capricious or in bad faith. Whether a contract calls for something, or whether its grant or denial would be arbitrary, capricious or in bad faith are not necessarily the same question. *See Sly v. P.R. Mallory & Co., Inc.,* 712 F.2d 1209 (7th Cir.1983); *Pinto v. Zenith Radio Corp.,* 480 F.Supp. 361 (N.D.Ill.1979), *affirmed without published opinion,* 618 F.2d 110 (7th Cir.1980).

7. To the extent that the language of *Adams v. Jersey Central Power & Light Co.,* 21 N.J. 8, 10, 120 A.2d 737, 739 (1956) suggests that assumption by the successor of the predecessor's obligations extinguishes the predecessor's liabilities, even in the absence of agreement by the employees to a novation, we respectfully decline to accept it as controlling. The language indicates that the question posed is whether "an obligation of severance pay rests upon [the

predecessor] or [the successor]." It states, in conclusion: "We have carefully examined the contract of sale and we do not find any basis for the assumption that [the successor] has undertaken to fulfill in its entirety [the predecessor's] obligation for severance pay under the terms of [the predecessor's] agreement with its employees."

8. Warner-Lambert has contended that it unilaterally introduced the severance policy and it has retained over the intervening years the right to interpret it. Warner-Lambert, however, does not appear to dispute that the severance policy did amount to a contract between it and its employees, especially the plaintiffs here. *Cf. Dahl v. Brunswick Corp.,* 277 Md. 471, 476, 356 A.2d 221, 224 (1976). The definition of what "employment termination" by way of job elimination or for other reasons of Company convenience means in that contract has, Warner-Lambert claims, nevertheless, remained within its control and it has never interpreted

Having made those observations, we hasten to point out that the result indicated by them is fraught with unsatisfactory aspects. If the arrival of January 21, 1982 gave rise to a termination of employment which automatically triggered rights to severance pay in each of the eight employees, they will have received an immediate payment, and yet, should they not be let go by PMP, they will also have qualified for retirement benefits from PMP computed on the basis of their employment dates with Parke-Davis or Warner-Lambert. In short they would continue just as they had before the divestiture of the Medical-Surgical Division, yet they ultimately would have received severance pay under circumstances it is essentially impossible to say were ever contemplated.

We need not explore in depth the question of whether, having received from Warner-Lambert severance pay calculated on a basis ranging back at least until January 1, 1969, they, should PMP subsequently discharge them, also be entitled to receive from PMP another, over-lapping, severance pay similarly relating back to when they first were employed by Parke-Davis.[9] However, the suggestion of the plaintiffs

that PMP will not be liable for severance pay in such a case because the contract between Warner-Lambert and PMP denies eligibility for PMP severance pay benefits to an employee "who validly releases the Seller from its obligations ... under the Seller's severance policy and practices" seems questionable. The release contemplated in the Warner-Lambert/PMP contract may not have been provided by the time collection from PMP is asserted if an employee terminated by PMP should choose first to pursue relief from PMP and to sue Warner-Lambert only after the successful conclusion of that effort. Also, a "release" could be interpreted to connote arrangements other than ones in which Warner-Lambert has paid severance pay benefits. The employees, moreover, emphatically are not parties to, or beneficiaries of, the contract between Warner-Lambert and PMP. Its terms consequently may not be binding on them at all. The language of the severance pay policies of the two companies may be all that controls.

Nor need we determine whether, if awarded severance pay as of January 20, 1982, payable by Warner-Lambert, for the purpose of pensions to which they will be-

the phrase to mean that severance pay should become due if Warner-Lambert, when terminating employment in connection with divestiture made a "just as good" arrangement with the new employer. Admittedly, however, that attempted gloss on the plain words of the severance policy had never, prior to January 21, 1982, been communicated to Warner-Lambert employees.

That presents a possible question which we can by-pass as to whether the credit of PMP is "just as good" as the credit of Warner-Lambert. The point is that the plaintiffs, and other employees, who had labored, since 1957, are the ones who possess the right, not Warner-Lambert, to decide whether they should take PMP in place of Warner-Lambert, letting the latter completely off the hook. It is not irrelevant to note that plaintiff Douglas Livernois, when asked if PMP was, in his opinion, financially sound, responded: "When compared to Warner-Lambert, no way." Plaintiff Douglas Dodds also made the obvious point: "... the financial situations are extremely different between Warner-Lambert and Professional Medical." Warner-Lambert was plainly at fault to the extent it has attempted to reckon without mine host.

The severance policy, since 1957, functioned as a document defining in part contractual relations. *Dulany Foods, Inc. v. Ayers,* 220 Va. 502, 509, 260 S.E.2d 196, 200 (1979); *Hercules Powder Co. v. Brookfield,* 189 Va. 531, 541, 53 S.E.2d 804, 806 (1949). Its language is perfectly unambiguous, and *if it is accepted that Warner-Lambert has gotten out from under its liability,* there being no novation with any of the eight employees, Warner-Lambert has terminated their employment, eliminated their jobs, and must cough up severance pay. *Chapin v. Fairchild Camera and Instrument Corp.,* 31 Cal. App.3d 192, 199–200, 107 Cal.Rptr. 111, 116–117 (1973); *Mace v. Conde Nast Publications,* 155 Conn. 680, 688, 237 A.2d 360, 363 (1967).

9. The parties have stipulated that:
   Under the terms of the severance policy in effect today at Professional Medical Products, plaintiffs are entitled to severance pay benefits from Professional Medical Products based upon prior years of service computed from initial dates of hire with Parke-Davis.
   The severance pay monetary benefits currently available to plaintiffs from Professional Medical Products are identical to those previously available to plaintiffs from Warner-Lambert.

come entitled upon retirement from PMP they would be able to require computation on the basis of January 1, 1969 as the latest starting date or only on the basis of "new" employment beginning January 21, 1982. Recognizing the severe inequitable "double dipping" aspects attendant upon the line of argument they were pursuing, the eight have purported to concede that, upon collecting severance pay from Warner-Lambert, any "continuing" employee of PMP would have to accept that, thereafter, January 21, 1982 would be the computation date for severance pay and pension purposes.

However, one may perceive a slight unsettling doubt as to whether such a concession by one of the present plaintiffs in the instant action would be binding in any subsequent suit by him or her against PMP. Moreover, it appears that the total number of continuing employees may number in excess of 45. Were we to accept the approach urged by the plaintiffs, we would provide authority supporting demands against Warner-Lambert by other employees for immediate severance pay, yet those other employees might not perceive any need to make a similar concession as to commencement date for purposes of benefits deriving from PMP. The agreement between Warner-Lambert and PMP seems subject to interpretations which would not allow non-demand or non-acceptance of severance pay from Warner-Lambert to be made a condition precedent to the applicability of the retroactive provisions for purposes of ascertaining starting dates of employment.

Consequently, to us, the proposed solutions both of plaintiffs and of defendant are each so flawed that another approach, even though neither of the parties prior to oral argument had advanced or considered it, has been selected by us as observably superior. The rule that things not dealt with at the district court level will not be considered on appeal [10] has been forged and applied to achieve, not to frustrate justice. The rule is inapplicable to "exceptional cases". *United States v. Chesapeake & Ohio R.R., supra.* We do not introduce a new concept achieving victory for a party on grounds which the party never advanced. Rather we settle on a disposition not wholly satisfactory to either party but commendable in that it avoids the inequities inescapably present in both of the solutions the parties have argued for.[11]

■ The correct disposition, it seems to us, is to recognize that, while ending by Warner-Lambert of all future, *i.e.,* post January 21, 1982, liability for job severance to those continuing as employees at PMP at comparable salaries plus the 1980 bonus would clearly constitute, as between Warner-Lambert and each of the eight plaintiffs job termination, for reasons of Company convenience, such is not the case, under the circumstances presented here, if Warner-Lambert remains primarily bound to make payments to those who will have qualified under the severance policy in the case of termination or elimination of a continuation job at PMP.[12]

---

**10.** *E.g. United States v. Chesapeake & Ohio R.R.,* 215 F.2d 213, 216 (4th Cir.1954); *cf. United States v. Parodi,* 703 F.2d 768, 783 (4th Cir.1983).

**11.** The fact that, when the alternative approach was broached at oral argument, counsel for Warner-Lambert indicated that it was something he was sure his client would find acceptable cannot be regarded as an unrestrained endorsement. Rather the handwriting was on the wall to the effect that the panel of the Court hearing the case had serious misgivings about the Warner-Lambert "solution". Counsel was expressing a preference for half a loaf rather than none.

**12.** The interpretation of the Warner-Lambert severance policy need be no less correct, simply because neither of the parties has advanced it. That it is correct may be gleaned from the evident fact that Warner-Lambert did all within its power, other than acknowledge in writing, to ensure a continuing liability for severance pay in the event of termination by PMP. The overwhelming purpose was to make employees fully as well off after January 20, 1982 as before. That predominant objective outweighs any drafting inadequacies and supplies implicitly an undertaking by Warner-Lambert to remain fully liable after January 20, 1982 for severance payments calculated in accordance with the Warner-Lambert policy if and when they might fall due, subject, however, to a

Warner-Lambert, of course, may transfer, and evidently has, transferred, to PMP the responsibility to make severance payments consonant with the terms of the Warner-Lambert severance policy. However, an agency to make payments does not free the principal of liability, and, if Warner-Lambert remains primarily liable, obligated to pay under its own severance policy should PMP fail to do so whenever payment is due and owing, then, as we construe the situation, viewed as a whole, no job elimination or termination for reasons of Company convenience has taken place as a consequence of the transfer of the continuing job effective January 21, 1982. While PMP is now the employer, at comparable levels of compensation and related benefits, Warner-Lambert remains responsible for the benefit

about which the litigation here centers. In that construct, we simply do not perceive "job elimination" or termination as having taken place in the case of any plaintiff, all of whom continue to occupy at PMP essentially the same jobs they held at Warner-Lambert.[13]

It is, of course, necessary to consider the contention that we have engaged in the forbidden practice of rewriting a contract for the parties. *See* 4 Williston on Contracts, 3rd ed. § 610A (1961) at 513 (". . . it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make"). We deny the aptness of any such charge made against us insofar as the eight employees are concerned. They simply were not parties to any contract relating to the substitu-

---

credit for any comparable severance payments made by PMP.

That solution renders inapplicable cases such as *Clarke v. Brunswick Corp.,* 48 Mich.App. 667, 211 N.W.2d 101 (1973) which states that " 'other suitable opening' meant an opening with the defendant corporation [and] . . . was not referring to a vacancy in a comparable position with . . . any other employer than Brunswick Corporation."). To the limited extent of severance pay, at least, Warner-Lambert remains the other party to the contract with the employees.

By the same token, the case of *Dahl v. Brunswick Corp.,* 277 Md. 471, 356 A.2d 221 (1976), properly looked at, affords no significant authority for the position of the plaintiffs. It is true that there the successor company established a comparable severance pay plan for employees taken over following a corporate divestiture and that the predecessor company was held liable for severance pay as of the date of divestiture. However, the cases comprising *Dahl* were only brought when the successor had gone or was on the brink of going bankrupt and out of business. The result in *Dahl,* therefore, making the predecessor company meet severance payment obligations, is entirely consistent with the approach we have taken and achieves the very result which we have indicated will eventuate should PMP go out of business for financial or other reasons.

**13.** Two things we do not undertake to decide.

First, we do not intimate whether or not other employee benefits, continued at comparable levels by PMP, will remain obligations of Warner-Lambert, subject to credit for all payments made by PMP. As for straight salary, it may well be that, at least after the first pay

period had passed for which the salary checks emanated from PMP, there was a novation by each employee who stayed on in his or her continuing job at PMP. Such might also be the case for any other benefit payable in installments. What other fringe benefits may exist is not fully determinable from the record, and, in any event, we are not called upon to face a case or controversy with respect to any that there may be. Sufficient to the day the evil thereof.

Second, we in no way suggest that a guarantee by the predecessor of whatever payments the successor company obligates itself to make automatically eliminates the possibility in all cases where a divestiture, in and of itself, otherwise might give rise to a claim for severance pay. A company could in its severance policy so state. However, Warner-Lambert provided, in effect, that the continuing job with any successor would have to remain substantially the same as the job with Warner-Lambert. If the benefits were different, despite all the continued obligation in the world on Warner-Lambert's part for those new and diminished benefits, the new job would be different. Hence the old job would terminate and the obligation to make severance payments simply because of the divestiture would, under the Warner-Lambert severance policy, ripen.

In other words, two tests here have to be met. Under one, there must be comparability, under which PMP will continue all pay and related benefits at levels at least equal to those which had been in force at Warner-Lambert. Under the second, Warner-Lambert must remain liable, with making by PMP of payments only creating a credit against that liability not a full discharge, unless and until the full amount due under the Warner-Lambert severance policy is received by the employee.

tion of PMP for Warner-Lambert as employer. Accordingly, there was no contract concerning that central aspect of the matter for us to rewrite.

We address here the consequences of the Warner-Lambert/PMP transaction and its attendant circumstances on the extant Warner-Lambert severance policy. The later contract covering the divestiture was independent of the eight plaintiffs. Construing the earlier severance policy in such a way as to leave Warner-Lambert with a continuing severance pay responsibility merely interprets, it does not alter or rewrite, the contract to which the eight plaintiffs were parties, namely, the Warner-Lambert job severance policy. As to it, our interpretation is one dating back to its inception. We have not assigned to it meanings it did not earlier have.

No one prior to the plaintiffs in the present case appears ever to have sought to construe the job severance policy as calling for payments upon divestiture in circumstances such as those here presented. Warner-Lambert certainly has not done so. Hence, there is no basis for an estoppel because of reliance on the part of any employee. We simply interpret the job severance policy, as written. When Warner-Lambert remains fully responsible for payments under its own severance policy to PMP employees if, but only to the extent PMP fails to satisfy the obligation, there simply is not, for the purposes of the Warner-Lambert severance policy, if for no other purpose, either job elimination by Warner-Lambert or a termination for reasons of its convenience.

Having sought to allay concerns about our supposed rewriting of an agreement, we, nevertheless, must acknowledge that we have proceeded to decision by a route not advocated by either party. As we indicated at the outset, the case tests, by exception to the normal rule, the customary course of litigation. That, however, is owing to the fact that each side has confined

its or their arguments to those supporting a better solution than either is entitled to. We apply the Golden Mean, and are satisfied that it provides the fairest solution.

Finally, with respect to the three employees who entered contracts with Warner-Lambert as of May 8, 1981, the agreement, in each case, provides protection after January 20, 1982, the effective date of the divesting sale, should PMP terminate the employee for other than just cause. That is the plain purpose of the agreement. The solution on which we have decided does precisely what the May 8, 1981 contracts call for. It provides protection after divestiture in the event that the purchaser terminates an employee for other than "just cause".

To recapitulate, the parties here have contended for two diametrically opposed positions. The plaintiffs urge (a) that they have identified the right defendant, Warner-Lambert, and (b) that job elimination has already occurred under the Warner-Lambert severance program. Warner-Lambert asserts that the plaintiffs are in error on both counts. We have decided, however, that each side is only 50% right. Warner-Lambert is the right defendant, but an event has not yet occurred occasioning payments of severance pay allowances.

Warner-Lambert can take comfort from the fact that the evil day is not yet. Nevertheless, Warner-Lambert remains ultimately liable and the plaintiffs need not fear the loss of Warner-Lambert's capability to meet severance pay obligations if and when liability for them matures.

In conclusion, we point out that the actions which have been brought are simply premature, and for that reason must be dismissed. Of course, there shall be no prejudice to reinstitution upon the occurrence in the case of each plaintiff of a job elimination or other event giving rise to a right of recovery of severance pay against Warner-Lambert.[14] The amount of any re-

---

**14.** With respect to the individual May 8, 1981 contracts negotiated with Warner-Lambert by three of the plaintiffs, we do not decide the

question of whether those contracts constitute novations which would bar the three from any recovery from Warner-Lambert at a later date,

covery in any such reinstituted case shall be computed in accordance with Warner-Lambert's severance policy with due allowance for any severance pay award by PMP to the employee or employees involved.

Accordingly, each of the eleven cases is reversed, and remanded for entry of a judgment consistent with the foregoing opinion.

REVERSED AND REMANDED.

should a termination occur and should any of the three plaintiffs reinstitute his action.