THE FREDERICK C. SMITH CLINIC, A PARTNERSHIP, APPELLANT, *v.* LASTRAPES, APPELLEE.

(No. 1098—Decided October 16, 1959.)

*Messrs. Strelitz, Halberstein & Mitchell* and *Messrs. Donithen, Michel & Davis,* for appellant.

*Messrs. Moore, Myers & Parsell* and *Messrs. Moloney & Kelly,* for appellee.

GUERNSEY, J. This is an appeal on questions of law and fact from a judgment of the Common Pleas Court for the defendant in an action for a restraining order brought by plaintiff partnership, the appeal being heard by this court *de novo* on the fourth amended petition, the answer and reply thereto, the transcript of the testimony adduced in the lower court and the exhibits thereto, and on the briefs and arguments of counsel.

It is undisputed that from a time prior to the commencement of any relationship between the parties to this action to the time this appeal was heard a medical clinic was operated in Marion County, Ohio, under the firm name of The Frederick C. Smith Clinic, by doctors of medicine associated together in a series of partnerships. Doctors F. G. Smith, P. W. Smith, J. W. Bull, R. E. Logsdon, R. W. Mills, C. W. Wilson and D. H. MacPherson have been members of each of these partnerships. The additional members of the respective partnerships and the dates of operation of the clinic by each of the partnerships are as follows:

Partnership No. 1 operated the clinic from February 1, 1954, to January 31, 1955, and included Doctors F. C. Smith and H. A. Cregg.

Partnership No. 2 operated the clinic from February 1, 1955, to January 31, 1956, and included Doctors F. C. Smith and F. C. Vogt.

Partnership No. 3 operated the clinic from February 1, 1956, to July 16, 1956, and included Doctors F. C. Smith, F. C. Vogt, T. N. Quilter, I. E. Michael and L. H. Birch.

Partnership No. 4 operated the clinic from July 16, 1956, to January 31, 1957, and included Doctors F. C. Vogt, T. N. Quilter, I. E. Michael, L. H. Birch, and F. G. Smith and P. W. Smith, as the coexecutors of the estate of Doctor F. C. Smith, deceased.

Partnership No. 5 operated the clinic from February 1,

1957, to January 31, 1958, and included Doctors F. C. Vogt, T. N. Quilter, I. E. Michael, L. H. Birch, and H. C. Blount, Jr.

Partnership No. 6 operated the clinic from February 1, 1958, to at least January 31, 1959, and included Doctors F. C. Vogt, T. N. Quilter and H. C. Blount, Jr.

Partnerships Nos. 2, 3, 5 and 6 were, in each case, evidenced by formal and detailed articles of copartnership, which, in each case, created a partnership which included one or more persons who had not been members of the preceding partnership. Partnership No. 1 is evidenced by an addendum to the formal and detailed articles of copartnership for a pre-existing partnership, the addendum incorporating the terms of the formal articles. Partnership No. 4 came into being by reason of the death of Doctor F. C. Smith, and existed under the provisions of the formal articles of copartnership for partnership No. 3 which became operative on the death of any partner. Each time a new partnership was created the books of the pre-existing partnership were closed and new books of account were opened for the new partnership.

It is also undisputed that, desiring his services, partnership No. 1 which was then operating the clinic entered into negotiations with the defendant Thomas S. Lastrapes, an orthopedic surgeon, which culminated in a written contract of employment executed on June 21, 1954. This contract, in the form of a letter of offer by the partnership and an acceptance by defendant, was signed by defendant and, on behalf of the then partnership, by each of the individual doctors composing the partnership. Among other things the contract provided:

"2. You will enter your employment on or about the 1st day of July, 1955, and * * *
"* * *

"5. This agreement shall automatically terminate in the event of your death or the dissolution of the partnership.

"6. In the event of the termination of your employment for any reason whatsoever, you covenant and agree that you will not engage in the practice of medicine within the limits of Marion County, Ohio, for a period of four (4) years from the date of such termination."

The formal articles of copartnership existing between the

partners at the time this contract of employment was executed, and incorporated by the addendum executed under date of February 1, 1954, "admitting" Doctor MacPherson to the partnership, among other things, provided:

"7. * * * Said partnership shall continue from the date hereof until January 31, 1954, *and thereafter from year to year* unless sooner terminated under the provisions hereof.

"8. Continuation of Partnership: A new partner or partners may be admitted to the partnership upon the same terms and provisions hereof, by endorsement hereon of all partners. * * *

"9. Termination of Partnership: Except as provided in the paragraph next following, the partnership herein created shall terminate upon the happening of any one of the following events:

"(a) The giving of notice, in writing, by any one of the partners to the other partners of his withdrawal from said partnership, specifying a future date to become effective as of the close of the fiscal year in which the partnership is then operating; "* * *

"In the event of the happening of any of the foregoing events, the remaining partners, excluding the one involved therein, shall continue partners, subject to all the terms and provisions hereof. * * *" (Emphasis added.)

On June 3, 1955, defendant reported to the clinic for work and there performed services as an orthopedic surgeon until January 1, 1957. From the date of the signing of the employment agreement hereinbefore referred to until the date on which defendant terminated his relationship with the clinic, no serious question was raised by the defendant, or by any of the various partnerships or the members thereof, as to the validity of the employment agreement, and the defendant was, during the time while he worked at the clinic, periodically paid for his services by the respective partnerships in accordance with the same formula for payment as that set forth in the written agreement of employment.

Following the termination of his employee relationship with the operators of the Smith Clinic, defendant engaged in the

practice of medicine in Marion County, Ohio, and was still so engaged at the time this case was heard by the lower court and by this court. The original petition was filed in the lower court on January 16, 1957, by and on behalf of the partnership known as partnership No. 4, omitting however the executors of the estate of F. C. Smith, from those partners therein named. The fourth amended petition, on which this action was heard, was filed on October 23, 1957, by and on behalf of partnership No. 4, including the executors of the estate of F. C. Smith. The fourth amended petition seeks to restrain defendant from practicing medicine within the limits of Marion County, Ohio, for a period of four years from January 1, 1957.

The issue thus before this court is whether the provision in the written employment contract of June 21, 1954, limiting defendant's professional practice as to time and area on the termination of his employment can be enforced by restraining order in an action brought by partnership No. 4.

The theory of plaintiff's case is that partnership No. 4, by reason of the continuous course of employment of defendant, his acceptance of pay from the various partnerships, his knowledge of the changes in personnel of the respective partnerships, his various acts and statements made after reporting for work with reference to the written employment contract, the provisions of the formal partnership agreements providing for the title of assets of the pre-existing partnership to pass to a succeeding partnership, and, on the legal theory of novation, has succeeded to and become possessed of all of the rights and benefits belonging originally to the partnership which signed the employment contract with defendant. The theory of defendant's case is that the withdrawal of Dr. Cregg from the partnership which signed the employment contract constituted a dissolution of the partnership and thereby terminated the written employment agreement under the provisions of paragraph 5 thereof, as of January 31, 1955, before defendant's employment was to, or did, begin.

Notwithstanding any provisions of the formal partnership agreement pertaining to partnership No. 1 by which the parties thereto appear to have attempted to obtain continuity of the partnership entity, it is apparent from the plain and ordinary

meaning of its provisions, hereinbefore quoted, and from the conduct of the respective partners in forming a new partnership under a new formal agreement, that the withdrawal of Dr. Cregg from the partnership as of January 31, 1955, operated to terminate partnership No. 1. To the extent that dissolution and termination do not coincide termination follows dissolution (Section 1775.29, Revised Code). If termination occurs then dissolution is either coincident therewith or has already occurred. Therefore, by the plain, ordinary, and unambiguous meaning of the provisions of the written employment agreement, that agreement, by reason of the dissolution of the partnership, automatically terminated not later than January 31, 1955. If such be the case defendant's employment under the terms and provisions of the written agreement never began, nor could he be charged under the terms and provisions of the written agreement with a restraint on the practice of his profession, which was conditional only on the termination of his employment thereunder. His employment not having begun under such agreement the same could not thereafter terminate under the agreement. Such must be the case unless there was a novation, or a series of novations, of the written employment agreement which would serve to bestow the benefits belonging to the employer thereunder, partnership No. 1, upon the plaintiff herein, partnership No. 4.

To be legally effective novation must occur, in point of time, on or before the date upon which the original agreement to which it pertains would otherwise expire.

"The doctrine of novation can never apply unless there is an existing, valid, and enforceable obligation to be discharged." 39 American Jurisprudence, 259, Novation, Section 12.

" 'Novation' may be defined as a substitution of a new contract for an old one *which is thereby extinguished.*" (Emphasis added.) 66 Corpus Juris Secundum, 681, Novation, Section 1.

It necessarily follows that since the written employment agreement herein would otherwise be terminated not later than January 31, 1955, novation would have to first occur on or before that date.

Moreover, it is basic to the law of novation that all the par-

ties to the original contract as well as all substituted parties must assent to the novation.

"It is a well-settled principle that an essential element of every novation is a new contract *to which all the parties concerned must agree*, and in the absence of such agreement or consent a novation cannot be effected." (Emphasis added.) 39 American Jurisprudence, 262, Novation, Section 17.

"As a general rule, in order to effect a novation involving the introduction of a new party, it is necessary that there be *a mutual agreement among the parties to the old and the new obligations whereby the new obligation* is substituted for the prior one." (Emphasis added.) 66 Corpus Juris Secundum, 699, Novation, Section 18.

See, also, *Grant-Holub Co.* v. *Goodman*, 23 Ohio App., 540 at page 549, 156 N. E., 151.

Plaintiff partnership's cause of action, if any, must be based on a series of novations, and it would be necessary that each novation be assented to by the defendant, by the partnership being released from the obligation, and by the partnership becoming a new party to the obligation, and if complete assent were lacking to any novation plaintiff's action would fail.

The issue may be resolved by determining whether defend-. ant assented to a contract of novation on or before January 31, 1955. To have done so defendant had to be aware on or before that date of the dissolution of the partnership which had contracted with him caused by the withdrawal of Dr. Cregg therefrom. The evidence as to this knowledge by defendant is in dispute. There is no evidence that the defendant was specifically informed that the partnership had been dissolved, and the earliest date in evidence at which time he could have become aware of Dr. Cregg's withdrawal was that testified to by Dr. P. W. Smith as being "in the latter part of February, 1955."

There is therefore no evidence of an assent by defendant to a contract of novation on or before January 31, 1955. There being no initial contract of novation, there could not be any series of novations. There being no novation, the restrictive covenant of the written employment contract terminated with the contract of which it was a part and was thereafter no longer enforcible, and defendant's employment commencing June 3, 1955, was not under or subject to the written contract.

Taking this view of the case, it is not necessary for us to determine, nor do we determine, whether the provisions of the restrictive covenant were reasonable as to time and area. And since this view completely disposes of this action, neither is it necessary for us to determine, nor do we determine, whether the plaintiff partnership, which itself has been dissolved and is merely winding up its affairs, can suffer such continuous irreparable injury as to be a proper party plaintiff in this action for injunctive relief.

*Judgment for defendant.*

MIDDLETON, J., concurs.

YOUNGER, P. J., dissenting. I am unable to agree with the majority of the court in the construction placed upon the various written instruments before us in this case, and I must dissent from the decision.

The so-called partnership No. 4, which is the plaintiff in this action, was in effect from July 16, 1956, to January 31, 1957. During this period the following important transactions took place:

1. During July 1956, some differences of opinion arose between the defendant and Dr. Frederick G. Smith and Dr. Philip W. Smith as to credit for services performed by two surgical preceptees, employed by the clinic, which was worked out between them, and on July 31, 1956, a letter was written and signed by The Frederick G. Smith Clinic, by J. W. Bull, partner, addressed to Smoot, Roush & Manter, the accounting firm employed by the clinic, being Exhibit No. 22, which contains the following:

"In connection with your accounting for direct expenses of the clinic *under the partnership agreement now in effect, and the contract of employment between the clinic and Dr. T. S. Lastrapes, dated July 1, 1955,* you are hereby advised that the following changes in treatment of salaries between surgical preceptees have been agreed to effective August 1, 1956." (Emphasis added.)

Instructions were then given as to credit on production accounts to patients for services rendered by Doctors Wolf and

Cameron, as well as to patients under the care of Dr. Lastrapes. At the bottom of this letter appears the following:

"Agreed to and accepted this 31st day of July, 1956. [Signed] Frederick G. Smith, Phillip W. Smith, T. S. Lastrapes."

2. On October 24, 1956, the defendant gave written notice to the clinic of his intentions of terminating his services on and after January 1, 1957; and yet, five days thereafter, on October 29th, 1956, the defendant joined in another letter to the accounting firm, being Exhibit No. 23, making further changes for charging the salaries of Drs. Wolf and Cameron, and credits to be made to the production account of Dr. Frederick G. Smith, Dr. Philip W. Smith, Dr. T. S. Lastrapes, Dr. Robert E. Logsdon, and Dr. D. H. MacPherson. This letter is also agreed to, accepted, and signed, by the five doctors involved, on October 29, 1956. This letter also uses the same instructions as the other letter, to wit:

"Under the partnership agreement now in effect, and the contract of employment between the clinic and Dr. T. S. Lastrapes dated July 1, 1954..."

This letter made some changes in charging some expenses incurred by the clinic, and contains this following paragraph, as Section b, which I consider very important:

"b. The above charges will be considered as direct charges, to be deducted from gross income in determining the basis for allocating general overhead of the clinic, and will be deducted from the gross income of Dr. T. S. Lastrapes *in computing compensation otherwise due him under his employment contract.*" (Emphasis added.)

3. During the latter part of 1956, the defendant raised a question as to his compensation for the first month of his employment. His contract of June 21, 1954, called for all moneys received for services rendered by him "for the first month of your employment." He began work on June 3rd, and his compensation was figured on money received from June 3rd to June 30th, inclusive. During this period, the defendant was out of town several days winding up his affairs in Cleveland. On September 26, 1956, the defendant had a conference with Mr. Manter, the accountant, who called Dr. Frederick Smith and told

him of the defendant's contentions, and Dr. Smith told Mr. Manter to give the defendant the benefit of this discrepancy and to give the defendant one hundred per cent of all money the clinic received for his services up to July 15, 1955. This was re-computed, and the defendant met again with Mr. Manter on November 5, 1956, to go over the figures and to be sure that his compensation up to July 15th was figured at one hundred per cent of the money thus received by the clinic. Thus, the defendant, after having given written notice on October 24, 1956, that he was leaving the clinic, was still insisting with Mr. Manter on November 5th that he be paid in strict accordance with his own interpretation of his original contract of employment.

A contract is a two-way street. Would the defendant admit that if the partnership with which he had contracted would have found the contract onerous it could have relieved itself of the burden of paying him $10,775.38 for the part year of 1955, and $26,921.12 for the calendar year 1956, by the simple process of adding or withdrawing one member of the partnership? Can the defendant—and he alone—take from the contract what he wants and leave what he doesn't?

It is stated in 30 Ohio Jurisprudence, 1100, Section 117, as follows:

"Dissolution operates prospectively.

"Those partnership rights and duties which have already vested are, in general, unaffected. The joint liability of all partners persists as before dissolution. In fact any other conclusion would violate the most fundamental principles of contract. That great mass of equitable doctrine involved in the problem of marshaling and distribution of assets rests upon this hypothesis. Similarly, the entire process of winding up, with all its incidental powers, would collapse without it."

A case very similar to the one at bar comes from the Supreme Court of Iowa, and is *Larsen* v. *Burroughs*, 224 Iowa, 740, 277 N. W., 463. In that case, the defendant, as was the defendant in the case at bar, a young, inexperienced physician, and with no acquaintanceship in LeMars, contracted with the LeMars Clinic, a partnership, the contract providing for the payment of eighteen hundred dollars a year beginning October 1, 1934. It does not appear from the record whether this contract

contained a provision for its termination in the event of the death of the defendant or the dissolution of the partnership. On page 747, the court says:

"Among the contentions of the defendant not covered by the foregoing is the claim that:

" 'The original co-partnership, which was the employer of the defendant in the original written contract, Exhibit D, by the retirement of one of its co-partners, W. T. Shepard, and the taking in of a new partner, L. C. O'Toole, has become dissolved by operation of law, and the present new firm not being a party to the original contract is not entitled to maintain this action thereon.'

"Without going into the matter of whether this contention would have been sound if timely made, it is sufficient to say that the defendant was not in a position to raise it after having operated under the new partnership the full time of the written contract and the extended period thereof. No contention of this sort was suggested by him and he continued his work and accepted pay according to the understanding of the parties. It is too late to raise it now."

With the above, I agree. However, disregarding all these legal niceties, I am of the opinion that, as I have heretofore pointed out, the plaintiffs and the defendant agreed upon and executed (1) on July 31, 1956, Exhibit No. 22 and (2) on October 29, 1956, Exhibit No. 23, valid, binding and enforceable contracts whereby the employment of Dr. Lastrapes was confirmed and accepted, and his compensation, although slightly reduced, became fixed. In my opinion it is entirely immaterial whether, on July 31st or October 29th, the contract of employment of June 21, 1954, was valid or invalid. The parties could just as well and just as legally have agreed upon employment and compensation "under the partnership agreement now in effect and the contract of employment between Dr. X and the Mayo Clinic dated January 1, 1920, a copy of which is enclosed."

The terms of employment and compensation would be fixed, definite and certain; the accountants would be able to ascertain the amounts and so forth, and if the contract of Dr. X contained a no-practice agreement, the parties then and there would, on those dates, have agreed to it, when it would have been, as

Exhibits No. 22 and No. 23 were, "agreed to and accepted" and signed by the parties.

In my opinion, there may occasionally arise a proper case, a proper time, or a proper circumstance, where legal hair-splitting *ad infinitum* might be necessary for a proper conclusion; that is, when that is necessary for a court not only to do justice, but also to seem to do justice. But, this case certainly is not one. A realistic and common sense view of this case discloses that the plaintiffs and the defendant—all highly educated and intelligent individuals—have for a period of over a year and a half consistently, persistently and conscientiously sought to do one thing, and that is to live up to and to perform to the best of their individual capabilities the agreement of July 21, 1954. Each side made concessions to the other. The clinic had the defendant's compensation for the first month recomputed, so that he could receive additional compensation in accordance with his own strict interpretation of the contract. The defendant, who made application to be admitted as a partner in December 1955, and then withdrew his application when he learned that he was making more money than most of the individual partners, made concessions by the agreements of July 31st and October 29th, in assuming a share of the salaries of the two medical preceptees who were assisting him with his patients and decreasing his work load. He even inquired of some of the partners whether they thought he would be held to the provision of his contract calling for not practicing in Marion County for four years if he terminated his contract.

Generally, contracts should be construed liberally so as to carry into effect the intentions of the parties, rather, than by resorting to technical construction, to render such contracts void. 11 Ohio Jurisprudence (2d), 398, Contracts, Section 154.

Contracts should receive a reasonable construction in order to carry out the presumed intention of the parties and not to arrive at absurd or impossible results. The parties are presumed to exercise rational rather than irrational action, and each is presumed to be exercising reason. 11 Ohio Jurisprudence (2d), 400, Contracts, Section 156.

Contracts are to be construed so as to lead to justice between the parties. 11 Ohio Jurisprudence (2d), 401, Contracts, Section 157.

The practical construction of a contract as made by the parties themselves, especially as shown by their acts and conduct in performing it after a period of operation, should be adopted by the court after a dispute has arisen between the parties, because, in such cases, the actions sometimes speak louder than words. 11 Ohio Jurisprudence (2d), 402, Contracts, Section 158.

Actions also speak much louder than afterthoughts.