BOLLING ET AL., APPELLANTS, *v.*
CLEVEPAK CORPORATION, APPELLEE.

(No. E-84-30 — Decided December 28, 1984.)

*Dennis E. Murray* and *Kirk J. Delli Bovi,* for appellants.

*Gregory B. Scott* and *William J. Wahoff,* for appellee.

HANDWORK, J. This case is before the court on appeal from a judgment of the Erie County Court of Common Pleas, which granted summary judgment in favor of defendant-appellee, Clevepak Corporation (hereinafter "Clevepak").

The essential facts are undisputed.[1] Plaintiffs-appellants[2] (hereinafter "appellants") were salaried employees of Clevepak. Appellants worked at Clevepak's folding box plant in Sandusky, Ohio. During the period of appellants' employment with Clevepak, the company distributed to its salaried employees a comprehensive personnel manual, entitled: "Clevepak Benefit Plans and Personnel Policies for Salaried Employees."[3]

In excess of one hundred pages, the manual contains several sections describing in detail life and accident insurance plans, retirement-pension plans, disability and medical benefits, and the schedules for such benefits. The last section of the manual is entitled "Clevepak's Personnel Policies and Practices." The introductory page to this section states, in part:

"This section * * * has been designed to provide you with a reference which not only explains Clevepak's various Personnel Policies and Practices, but which also serves as a guide to help you in the performance of your daily activities.

"Because we consider you, our employees, to be one of our most vital resources, *we have provided a broad spectrum of policies and programs designed to insure your personal and professional development and well-being.*" (Emphasis added.)

This "personnel policies and practices" section contains a variety of information and representations relating to employment performance, attendance, leaves of absence, vacation and holiday schedules, health services and termination of employment. The subsection entitled "Termination of Employment" provides, in relevant part:

"Termination of Employment

"CLASSIFICATIONS OF TERMINATION

"Whenever an individual leaves the employ of the Company, the termination will be classified as one of the following:

"Resignation: Voluntarily initiated by the employee.

---

[1] The record herein consists of Clevepak's employment manual, the purchase and letter agreements between Clevepak and PRT, two affidavits of appellant Frank Bolling and one affidavit submitted by Jon van Kerkhoven, formerly president and general manager of Clevepak's Carton Container & Core Division, which included the Sandusky Folding Box Plant when Clevepak owned it.

[2] Three of the original twelve plaintiffs are apparently not included as appellants in this appeal. Two have resigned, while the other was a nonexempt, temporary employee to whom Clevepak's severance policy did not extend.

[3] While the record does not disclose exactly when the manual was first distributed to the employees, we do note that the final page to each section contains a date, presumably indicating when the most recent amendment thereto was effective. The date appearing on the final page of the "personnel policies and practices" section is: "12/1/80."

"Separation For Reasons Other Than Cause: *Initiated by the company for reasons beyond the control of the employee* (reorganization, cutback, relocation, etc.)

"Separation for Cause: Initiated by the Company for failure on the part of the employee to meet satisfactorily the requirements of the assigned job (poor performance, etc.)

"Discharge: Initiated by the Company because of misconduct on the part of the employee (just cause, theft, conflict of interest, actions detrimental to the Company, etc.)

"Normal Retirement: On or after age 65.

"Early Retirement: Between the ages of 55 and 65 with fifteen years of service.

"NOTICE OF TERMINATION

"Customarily, it is expected that written notice of resignation will be given at least two weeks in advance of the anticipated termination date.

"Where the separation is initiated by the Company, as much notice as possible will be given the employee. However, where the discharge is for reasons of serious misconduct, it is possible that the termination will be immediate, without prior notice.

"* * *

"SEVERANCE PAY

"*Depending upon the reason for termination,* an employee may be eligible for severance pay as outlined below:

"Separation For Reasons Other Than Cause: *One week's salary will be paid for each year of Company service* with a minimum of two weeks and a maximum of thirteen weeks.

"If, however, an employee scheduled for separation for reasons other than cause declines an offer of a comparable position *elsewhere in the Company,* severance pay entitlement is one-half week's pay for each year of Company service with a minimum of two weeks and a maximum of thirteen weeks.

"Separation for Cause: As long as the employee has not been discharged for misconduct, severance pay entitlement is one-half week's pay for each year of Company service with a minimum of two weeks and a maximum of thirteen weeks.

"Special Situations: *In special situations,* such as a mass move of an operating unit, *a separate policy covering* terminations and *severance payments will be established which will be applicable to all affected personnel.*

"Resignation, Discharge and Retirement: Employees who resign, are discharged or take a normal or voluntary early retirement are not eligible for any severance pay." (Emphasis added.)

As noted, each salaried employee received a copy of this manual, including the above-quoted sections. Beyond these provisions on severance pay and termination of employment, and insofar as the record discloses, Clevepak's management personnel made no additional *oral* representations that severance benefits would be paid other than according to the terms of the manual.

In the summer of 1983, Clevepak entered into negotiations for the sale of the assets of the Sandusky plant to PRT Corporation, d.b.a. Sandusky Folding Box Company, Inc. (hereinafter "PRT"). Effective August 31, 1983, a purchase agreement was executed between Clevepak and PRT for the sale of the plant. Executed contemporaneously therewith was a "letter agreement," also dated August 31, 1983, in which PRT agreed to retain Clevepak's salaried personnel (including appellants). The letter agreement further stated:

"It is our [PRT's] intention to hire all of your [Clevepak's] full-time salaried employees, * * *. In the event we fail to hire any of such employees or terminate any of them except for cause on or before November 2, 1983, *we shall pay each of such employees a severance allowance in accordance with the*

*Schedule annexed hereto and, on demand, you agree to reimburse us up to an aggregate of $3,500.00 with respect to such payments, it being understood that we will bear the expense of such payments, if any, in excess of $3,500.00. It is understood that we are not hereby* undertaking to make any severance payments to any of your employees except as herein explicitly stated and *that this Agreement is not intended to be for the benefit of any third party.*" (Emphasis added.)

The schedule of severance payments attached to the letter agreement listed each salaried employee being retained and the corresponding amount of severance pay to which that employee would be entitled if PRT did not continue to employ him or her through November 2, 1983.[4] Severance pay was computed under the previously mentioned provision for "separation for reasons other than cause."

Following execution of the purchase and letter agreements, appellants continued working at the folding box plant under their successor-employer, PRT. To date, appellants are still employed there, and no severance benefits have been paid to them by either PRT or Clevepak.

On November 17, 1983, appellants commenced this action against Clevepak, seeking as damages the various amounts of severance pay allegedly due them under the manual's severance provisions. Both parties moved for summary judgment in the trial court. The court granted Clevepak's motion, denied

appellants' cross-motion and thereafter dismissed the complaint. This appeal followed. Appellants' sole assignment of error is:

"The trial court erred in granting defendant's motion for summary judgment and in denying plaintiffs' motion for summary judgment."

I

Appellants contend that Clevepak's personnel manual, and in particular its severance provisions, became a binding part of their employment relationship with the company, an *express* contract they argue, relying principally upon the unilateral-contract modification theory recently adopted by this court in *Helle* v. *Landmark, Inc.* (1984), 15 Ohio App. 3d 1; see, also, *Jones* v. *East Center for Community Mental Health, Inc.* (1984), 19 Ohio App. 3d 19, 24 (Douglas, J., concurring in judgment only).

In so arguing, appellants maintain that Clevepak's failure to pay severance benefits consistent with the manual's "separation-for-reasons-other-than-cause" provision, despite their continued employment following PRT's purchase of the plant, constituted a breach of those terms. As they view the severance provisions, appellants do not regard the "special situations" clause as carrying any import insofar as Clevepak's primary obligation to them is concerned.

Not unexpectedly, Clevepak argues, first, that the manual was never intended to be a contract, or to state terms of severance pay binding on the com-

---

[4] The letter agreement also provided:

"It is further understood that you [Clevepak] will maintain for all full-time hourly employees at such plant the following insured benefits through the dates indicated:

"Group Life Insurance
    September 9, 1983

"Accidental Death and Dismemberment and Weekly Indemnity    September 2, 1983

"Medical    September 14, 1983,

"but that you will not continue insured benefits for salaried employees at such plant after August 31, 1983, and that we shall provide insured benefits for such salaried employees thereafter, *the benefits to be provided by us, however, not necessarily being the equivalent of those provided by you.*" (Emphasis added.)

pany, but was merely a compilation of "guidelines" through which to articulate company policy on certain matters. Clevepak also takes the position that the manual (and therefore its terms) cannot be a contract, because there was neither a promise of severance pay made nor an effective acceptance of the severance pay terms, even construing them to have been an "offer" in the contractual sense. The company further suggests that even assuming, under the *Helle* doctrine, there existed a contractual obligation to furnish severance benefits to appellants, it fully discharged that obligation by arranging for their severance pay through the letter agreement with PRT, thereby complying with the "special situations" clause.

### A

Although Clevepak claims that its position is consistent with our holding in *Helle* v. *Landmark,* its arguments against the manual's contractual significance belie a myopic reading of that opinion. Initially, Clevepak would distinguish the *Helle* case on the ground that the numerous *oral* assurances of severance benefits, coupled with the written severance policies Landmark's employees later received, were conclusive there on the question of whether a viable offer had been made. Here, Clevepak points out, its supervisory personnel never made any oral assurances at any time that appellants would receive severance pay. They were simply given the manual unaccompanied by any oral representa-

tions. Therefore, Clevepak concludes, there was no promise.[5]

The problem with this reasoning is the implicit assumption that *oral* assurances of the kind present in the *Helle* case are always *required,* apart from any written representations, to create a viable offer of severance pay. Yet, as we stated in *Helle* v. *Landmark, supra,* at 8:

"When * * * oral *or written* modifications of the original employment contract satisfy the paradigm elements essential to contract formation — *i.e.,* offer, acceptance, consideration — binding obligations arise. * * *

"'* * *

"To become binding, a promise or offer *need not* be in writing — an oral representation, whether denoted as a 'promise,' 'offer,' or 'proposal,' is sufficient to bind the party in the position of the promisor if accepted by the putative promisee and supported by consideration." (Emphasis added.)

Thus, a written representation, whether standing alone or given in conjunction with other verbal assurances, can be an "offer" if the usual contract tests are satisfied. See Restatement of the Law 2d, Contracts (1981), Section 4. As the *Helle* opinion made clear, the employees (as putative promisees) must be justified "in understanding that a commitment has been made." *Helle* v. *Landmark, supra,* at 9, quoting Restatement of the Law 2d, Contracts, *supra,* at 8, Section 2. Here, that test was fully met, since a reasonable person

---

[5] Regarding this issue, Clevepak injects a confusing *non sequitur* by referring to the *Helle* opinion's holding on "disclaimers," *i.e.,* that *oral* assurances of severance pay will negate the effect of a manual's *written* disclaimers, and then arguing that because no oral assurances were made here, there was no offer (or promise) of severance pay. Whether or not contrary oral assurances will negate disclaimers found in an employer's

writing is quite separate and distinct from resolving the relatively simple contract question of whether written severance provisions, standing alone, amount to an offer of severance pay, which is all that we decide in this case. The specific holding in *Helle* v. *Landmark, Inc.* (1984), 15 Ohio App.3d 1, as to written "disclaimers" was made clear in the context of that case. See *id.* at 10.

in appellants' position, upon receiving this manual and reading these severance provisions, would be justified "in believing that 'a commitment [had] been made.'" *Helle* v. *Landmark, supra.* Moreover, under the Second Restatement's test, an offer may be construed as a "promise" when it proposes the exchange of a promise for a performance by the promisee. When such an exchange is proposed, "the offer itself is a promise, revocable until accepted." See *id.,* at Section 24, Comment *a;* see, also, *Sigman* v. *Rudolph Wurlitzer Co.* (1937), 57 Ohio App. 4 [10 O.O. 17]. Nevertheless, whether analyzing the severance provisions as a set of written promises or as a written offer proposing to exchange severance benefits (the promise) for appellants' continued job performance, the result is still the same. Contrary to Clevepak's protestations, the language used in these provisions is clear and definite, evincing an intent to furnish severance pay when the employees fulfilled the conditions stated therein. Significant, also, is the fact that the severance provisions carried no equally explicit "disclaimer" to indicate that Clevepak did not intend to be bound by any language employed in those provisions.

## B

Clevepak also asserts that any offered severance benefits were never "accepted" by appellants, because "[r]emaining in employment alone is insufficient to constitute acceptance by [the employees] of any promise." That, however, is precisely the theory we rejected in *Helle* v. *Landmark,* at 10-11, where we said:

"Here, * * * [the] offer of severance pay precipitated the formation of a unilateral contract, and acceptance was effective when appellants remained with * * * [the company] after learning of the new severance policy. * * * [Citations and footnote omitted.] * * * For purposes of consideration, the employee's retention of his position and continued performance of his work suffice to render the new condition of severance pay enforceable.

"* * *

"In this case, therefore, appellants accepted * * * [the] offer of severance pay by rendering their performance (*i.e.,* by retaining their employment with * * * [the company]), and sufficient consideration was furnished to support [the] * * * offer when appellants continued working after they learned of the offer of severance pay." (Footnote and citations omitted.)[6]

It is thus too late in the day for Clevepak to escape the contractual consequences of its "personnel policies and practices," policies which it willingly disseminated among its employees, but which it now claims lack fundamental contract elements. In this respect, the spirit of Clevepak's position brings to mind the much discredited plea that "I didn't know the gun was loaded." Things are quite otherwise, however. Ohio, like the majority of jurisdictions, presently views the employer's promulgation of employment manuals, employee handbooks or other writings, styled "personnel policies and practices," as giving rise to rights enforceable in contract, if the necessary elements reasonably appear from the facts, as they do here. See *Helle* v. *Landmark, supra,* at 6-8, and cases cited therein; see, also, *id.,* at 14 (opinion of Douglas, J., concurring); *Jones* v. *East Center for Community Mental Health, supra,* at 24 (concurring opinion of Douglas, J.); *Sigman* v. *Rudolph Wurlitzer Co., supra,* at 5 (The employer's "booklet" describing pension benefits "constituted a continuing offer on the part of the company, which was continuously accepted by the employees

---

[6] See *Helle* v. *Landmark, Inc., supra,* at 10, fn. 10.

who preserved their status with the company." *Id.*); see, also, *e.g., Fletcher v. Amax, Inc.* (1981), 160 Ga. App. 692, 288 S.E. 2d 49, 51 ("[A]n additional compensation [or severance] plan offered by an employer and impliedly accepted by an employee, by remaining in employment, constitutes a contract between them[.]" *Id.*).[7]

Having thus concluded that Clevepak's manual created a binding obligation to furnish severance pay, we proceed next to the various issues raised by those provisions.

## II

### A

The controversy over the meaning of Clevepak's severance provisions is prompted by a misconception of the nature of severance pay. Clevepak appears to imply that severance payments, like certain "fringe benefits," are a discretionary largess which employers are free to revoke when business turns bad or when their generosity wanes.

However, since employers presumably seek, and in fact do seek, loyal, hard-working employees — the kind of employees who can be counted upon to remain with the company during economic upswings and downswings — the modern approach is to view severance pay as "a form of deferred compensation for continued service," not as a mere gratuity.[8] *Helle* v. *Landmark, supra,* at 7; *Johnson* v. *Allied Stores Corp.* (1984), 106 Idaho 363, 679

---

[7] Since the employer-employee relationship is one arising in contract, either express or implied, see *Floyd* v. *DuBois Soap Co.* (1942), 139 Ohio St. 520 [23 O.O. 20], some jurisdictions verge on suggesting that the employees' implied acceptance of offered benefits can be *presumed* from: (1) the employer's distribution of a writing, whether or not accompanied by oral representations, which introduces terms, conditions or benefits not theretofore offered them or which changes old ones; (2) the fact that the employees receive the writing or subsequently come to know of the terms, conditions, or benefits contained therein; and (3) the fact that the employees, after receiving the writing or learning of its contents, continue in their employment with the employer. See *Kulins* v. *Malco, A Microdot Co., Inc.* (1984), 121 Ill. App. 3d 520, 459 N.E.2d 1038; *Fletcher* v. *Amax, Inc.* (1981), 160 Ga. App. 692, 288 S.E. 2d 49; *Martin* v. *Mann Merchandising, Inc.* (Tex. Civ. App. 1978), 570 S.W. 2d 208; *Anthony* v. *Jersey Central Power & Light Co.* (1958), 51 N.J. Super.139,143 A. 2d 762; cf. *Saunders* v. *Big Bros., Inc.* (1982), 115 Misc. 2d 845, 454 N.Y.Supp. 2d 787.

[8] Ohio cases in particular have implied, if not directly held, that items of compensation intended as such by private-sector employers, *once earned,* must be paid. Moreover, when disputes do arise, general contract principles guide the determination of what is or is not required under, for example, an employer's severance policies, profit-sharing plans, retirement or pension plans, "bonus" arrangements and the like. See, *e.g., Luli* v. *Sun Products Corp.* (1979), 60 Ohio St. 2d 144 [14 O.O. 3d 384] (retirement benefits); *Sheehy* v. *Seilon, Inc.* (1967), 10 Ohio St. 2d 242 [39 O.O.2d 374] (group insurance plan); *Cantor* v. *Berkshire Life Ins. Co.* (1960), 171 Ohio St. 405 [14 O.O.2d 157] (retirement benefits); *Mabley & Carew Co.* v. *Borden* (1935), 129 Ohio St. 375 [2 O.O. 375] ("bonus" certificate created vested right in employee's designated beneficiary); *Helle* v. *Landmark, Inc., supra* (severance pay); *Blackwell* v. *Internatl. Union, U.A.W.* (1983), 9 Ohio App. 3d 179 (pension benefits); *Vavrek* v. *Republic Steel Corp.* (1979), 65 Ohio App. 2d 17 [19 O.O.3d 11] (pension agreement); *Ellis* v. *Victor Elec. Prod., Inc.* (1949), 85 Ohio App. 170 [40 O.O. 122] (When payment of "bonus" is part of employment contract, it is not a "mere gratuity."); *Harding* v. *Montgomery Ward Co.* (App. 1944), 41 Ohio Law Abs. 243 (yearly "bonus" under employment contract); *Sigman* v. *Rudolph Wurlitzer Co.* (1937), 57 Ohio App. 4 [10 O.O. 17] (pension plan); cf. *Wallace* v. *North Ohio Traction & Light Co.* (1937), 57 Ohio App. 203, 210-212 [10 O.O. 354] (pension); *contra, Black* v. *W. S. Tyler Co.* (1917), 12 Ohio App. 27, 31-34 (profit-sharing plan, but no contract found to bind employer).

P. 2d 640, 644; *Dulany Foods, Inc.* v. *Ayers* (1979), 220 Va. 502, 260 S.E. 2d 196; *Owens* v. *Press Publishing Co.* (1956), 20 N.J. 537, 120 A. 2d 442, 446.

Severance pay is an *earned* benefit, one for which the employees work as much (and as hard) as they work for any other benefit or item of compensation. *Kulins* v. *Malco, A Microdot Co., Inc.* (1984), 121 Ill. App. 3d 520, 459 N.E. 2d 1038, 1043-1044. That being the case, it must then be realized that, as deferred compensation, severance pay *accrues* while it is being earned during the course of the employment relationship. See *Johnson* v. *Allied Stores Corp., supra,* at 644. Hence, once earned through their continued work, the employees' right to receive severance pay is, in a sense, *"vested."* Once earned, that right (and the amount of pay theretofore accrued) cannot thereafter be *retroactively* modified, diminished or eliminated by the employer, except through a valid contractual arrangement to which the employees are a consenting party. *Helle* v. *Landmark, supra,* at 12-13; *Johnson* v. *Allied Stores Corp., supra* ("[A] contractual right to severance pay creates an obligation in the employer to furnish the severance pay due to the employee under the contract. This obligation does not cease upon termination or modification of the contract. Subsequent modifications are effective *prospectively* only." [Emphasis added.] *Id.* at 646.); *Kulins* v. *Malco, supra* ("When [the employee's] services are rendered, the right to secure the promised * * * [severance pay] is vested as much as the right to receive wages or any other form of compensation[.]" *Id.* at 1044); *Langdon* v. *Saga Corp.* (Okla. App. 1976), 569 P. 2d 524, 527-528; *Owens* v. *Press Publishing Co., supra* ("* * * [O]nce the right [to severance pay] thus comes into being [during the subsistence of the employment contract] it will survive the termination of the agreement." *Id.* at 448); see, also, *Chapin* v. *Fairchild Camera & Instr.*

*Corp.* (1973), 31 Cal. App. 3d 192, 107 Cal. Rptr. 111, 115-116.

This is simply a matter of economic parity. Otherwise, an employer could, with contractual impunity, dangle the carrot of severance benefits before the eyes of its employees and then, years later, diminish or withdraw those benefits completely, having received an economic value *without* returning an equivalent one to those from whom that value came. *Kulins* v. *Malco, supra,* at 1044. Given this perspective, what result do the specifics of Clevepak's severance provisions entail?

## B

Since this case involves uncontroverted facts, the only issue regarding the written severance provisions is one of contract interpretation, which is a question of law for the court. *Alexander* v. *Buckeye Pipe Line Co.* (1978), 53 Ohio St. 2d 241 [7 O.O.3d 403]; *Luntz* v. *Stern* (1939), 135 Ohio St. 225 [14 O.O. 62]. In interpreting these severance provisions, we are mindful of two salutary rules of construction, both of which have special force in the context of employment manuals. First, because the employer drafted the manual's contents, the termination and severance provisions therein will be construed most strongly against it. *Sigman* v. *Rudolph Wurlitzer Co., supra;* cf. *Luli* v. *Sun Products Corp.* (1979), 60 Ohio St. 2d 144, 147 [14 O.O.3d 384]; 18 Ohio Jurisprudence 3d (1980) 34, Contracts, Section 149; see, also, *Dangott* v. *ASG Indus., Inc.* (Okla. 1976), 558 P. 2d 379.

Second, parties to an employment contract, as with any other contract, are bound toward one another by standards of good faith and fair-dealing. *Fortune* v. *Natl. Cash Register Co.* (1977), 373 Mass. 96, 364 N.E. 2d 1251; cf. *Firemen's Ins. Co.* v. *Antol* (1984), 14 Ohio App. 3d 428, 429. Accordingly, "fraud [or bad faith] is never presumed, and where two constructions [of an employer's writing] are possible, one of

which requires a finding of fraudulent intent, and the other permits a conclusion of good faith, courts never hesitate in giving effect to the latter interpretation." *Sigman* v. *Rudolph Wurlitzer Co., supra,* at 7.

Here, Clevepak's obligation to tender severance payments hinged upon the pertinent "triggering event," in effect a condition subsequent, as defined in the manual's six "classifications of termination." The only pertinent classification is "separation for reasons other than cause," which Clevepak defined as:

"[Separation] [i]nitiated by * * * [Clevepak] for reasons beyond the control of the employee (reorganization, cutback, relocation, etc.)"

This definition of "termination," in terms of "separation" for reasons not of the employees' making, is indeed broad. In any rational sense of the word "separation," and as further qualified by the additional language, appellants were clearly "separated" (and therefore "terminated") by Clevepak through its sale of the plant to PRT.

Given that this triggering event occurred, the "separation-for-reasons-other-than-cause" provision entitles an employee to "[o]ne week's salary * * * for each year of * * * [employment]." Next, the "special situations" clause, stripped of its nonessential verbiage, states that in such cases "a separate policy covering * * * severance payments *will be established*[.]" (Emphasis added.)

Since appellants' "separation" from Clevepak triggered their right to receive severance pay, Clevepak was obligated, as of August 31, 1983, to pay them the amount of accrued severance pay due under the aforementioned formula. Assuming good faith on Clevepak's part

in *not* drafting the "special situations" language as a covert forfeiture provision, it could *only* mean that even in situations the company deemed "special," Clevepak would still furnish each employee who was "separated" severance pay consistent with the stated formula. Having accrued during appellants' employment with Clevepak, their right to severance pay, and the company's obligation to pay it, matured fully on August 31, 1983. In short, any accrued severance pay was due and owing *as of that date.*

At best, while the "special situations" clause would permit Clevepak some leeway in arranging with a successor-employer for full payment of severance benefits, perhaps through a "50/50" agreement, Clevepak nevertheless remained (and still remains) primarily liable for any unpaid (but accrued) severance benefits. In this respect, any payments the new employer made would only create a *credit,* as against Clevepak's primary liability, and not a *discharge,* until each employee who qualified under the appropriate "termination" category received the full amount of accrued pay to which he or she was entitled under the severance formula. Clevepak could not, through the "special situations" clause, avoid its primary liability to appellants, unless it first entered a new contract with them (a novation), a possibility we will address shortly.

C

In determining the meaning of Clevepak's severance provisions through accepted rules of contract construction, we note that neither counsel has cited any case directly on point. Our independent research has disclosed only one.[9] That case, *Livernois* v. *Warner-*

---

[9] In an observation equally applicable here, the *Livernois* court stated:
"There is no dearth of cases dealing with

similar situations arising upon spin-offs of going businesses and continued operation by the purchaser with employees formerly

*Lambert Co., Inc.* (C.A. 4, 1983), 723 F. 2d 1148, is virtually identical to this one, though it does differ critically in one respect. There, the plaintiffs-employees sued their former employer, Warner-Lambert, for severance pay. Each plaintiff had been employed previously by Warner-Lambert at a facility subsequently purchased by another company (PMP, Inc.). Warner-Lambert had, since 1957, maintained a severance policy for employees meeting certain conditions as to age, length of service with the company, etc. For employees meeting those conditions, Warner-Lambert's severance policy stated that "an employee terminated by the Company, *as a result of job elimination,* * * * or other reasons of Company convenience" would receive severance pay. (Emphasis added.) *Livernois* v. *Warner-Lambert, supra,* at 1149. As part of the sale of the corporate division where the plaintiffs worked, the *Livernois* court observed that:

"Warner-Lambert and PMP [the new employer] contracted that the other benefits, *e.g.,* retirement plan entitlements for the employees in general · * * * would be comparable to those enjoyed by them as Warner-Lambert employees prior to January 21, 1982. * * * That agreement explicitly applied only to Warner-Lambert and PMP, expressly denying third-party beneficiary status for any one, including employees.

"Warner-Lambert, by the agreement with PMP, obtained assurances that all employees transferred from the Warner-Lambert payroll to the PMP payroll as a consequence of the acquisition would become entitled to severance pay and other benefits on a comparable basis, with computations based on dates of original employment calculated by counting for such purposes service for * * * Warner-Lambert." (Footnotes omitted.) *Id.* at 1151.

The *Livernois* court found that the employees' right to severance pay was contingent upon a "triggering event," specified in the policy as: "Termination of employment * * * as a result of *job elimination*[.]" (Emphasis added.) Since the employees were, in fact, retained by PMP in jobs "substantially the same" in all material respects as those held at Warner-Lambert, "there simply has been no elimination of the job." *Id.* at 1153. Since job *continuation* is the opposite of "job elimination," the court reasoned, severance pay, though it had accrued, was *not yet* due and payable until the employees *actually lost their jobs.* Noting that the employees' severance pay had accrued under the terms of Warner-Lambert's policy before the company sold the employees' division to PMP, the court also stated that "[t]he * * * employees could not, simply as a matter of fiat, be forced to give up their rights under the severance policy in the event of job elimination at Warner-Lambert or termination of employment for other reasons of Company convenience." *Id.* Accordingly, the *Livernois* court held, at 1155-1156:

"* * * Warner-Lambert remains primarily bound to make payments to those who will have qualified under the severance policy in the case of termination or elimination of a continuation job at PMP. [Footnote omitted.]

"Warner-Lambert, of course, may transfer, and evidently has, transferred, to PMP the responsibility to make

engaged by the concern which has divested itself of the business. * * * However, the question being, in each case, one of contract interpretation, and the variation of language spelling out the particular circumstances in which a right to severance pay will arise approaching the infinite, the cases provide at most very general guidance. In the end, each decision is essentially *sui generis.*" *Livernois* v. *Warner-Lambert Co., Inc.* (C.A. 4, 1983), 723 F. 2d 1148, 1151-1152.

severance payments consonant with the terms of the Warner-Lambert severance policy. *However, an agency to make payments does not free the principal of liability,* and, if Warner-Lambert remains primarily liable, obligated to pay under its own severance policy should PMP fail to do so whenever payment is due and owing, then, as we construe the situation, viewed as a whole, *no job elimination * * * has taken place* as a consequence of the transfer of the continuing job * * * [to PMP]. While PMP is now the employer, at comparable levels of compensation and related benefits, *Warner-Lambert remains responsible for the * * * [severance benefits] about which the litigation here centers. * * *"* (Emphasis added.)

The distinguishing feature in *Livernois* v. *Warner-Lambert* is, of course, the very specific triggering event of "job elimination." Indeed, the *Livernois* court described the employees' lawsuit for severance pay as "premature." *Id.* at 1157. Here, no similar condition of "job elimination" appears in Clevepak's severance policy. Rather, the triggering event is only "separation" from Clevepak for "non-cause" reasons. While job elimination in this case has not yet occurred, that was *not* a factor relevant to or a requisite condition for the satisfaction of Clevepak's severance obligation.

Hence, we can only conclude that Clevepak, by the terms of severance provisions it drafted, remains fully liable to appellants for any unpaid severance benefits accruing prior to August 31, 1983. Should PRT have furnished any amounts after that date to any appellants terminated before November 2, 1983, such payments can be counted as credits against that amount which Clevepak still owes each appellant as of August 31, 1983.[10] See *Livernois* v. *Warner-Lambert, supra,* at 1154-1155 (employees not entitled to "double-dipping").

### III

While Clevepak has unwaiveringly claimed that the letter agreement with PRT adequately implemented its obligation under the "special situations" clause, the company has also advanced, as a final argument, a sophisticated novation theory.

Clevepak claims that "* * * when the successor-employer [PRT] has obligations to provide severance pay equivalent to the benefits promised by the old employer pursuant to agreement, no separate compensation is due from the old employer." Clevepak cites *Armstrong* v. *Diamond Shamrock Corp.* (1982), 7 Ohio App. 3d 296, and intimates that the letter agreement effected a "novation" among itself, the new employer (PRT) and appellants, as the creditors-employees, for any accrued severance pay then due and owing. From this premise Clevepak concludes that the letter agreement, as a "novation," extinguished any further obligation it had under the manual's severance provisions, since appellants impliedly assented to the terms of the letter agreement by continuing their employment with the successor-employer.

There is, in Ohio, some authority for this theory. See *Union Central Life Ins. Co.* v. *Hoyer* (1902), 66 Ohio St. 344; *Armstrong* v. *Diamond Shamrock Corp., supra,* at 299; see, generally, 39 Ohio Jurisprudence 3d (1982) 64, Em-

---

[10] As regards PRT and the terms of the letter agreement, the latter document is conspicuously silent as to PRT's severance pay obligation after November 2, 1983. Of course, as a matter of corporation law, PRT has no liability for obligations or debts it did not specifically contract to assume in the agreement. See 12 Ohio Jurisprudence 3d (1979) 378, Business Relations, Section 701.

ployment Relations, Section 33. Yet, it is equally true that for a "novation" to be effective, *all* the *parties* must agree to the substitution of the new debtor for the old one, and, therefore, to the new or changed terms pursuant to which the substitution is made. Intent, knowledge and consent are the essential elements in determining whether a purported novation has been accepted. See, *e.g.*, *Frederick C. Smith Clinic* v. *Lastrapes* (1959), 111 Ohio App. 42 [13 O.O.2d 411]; *Garrett* v. *Lishawa* (1930), 36 Ohio App. 129; see, also, 18 Ohio Jurisprudence 3d (1980) 207-213, Contracts, Sections 285-289.

A party's knowledge of and consent to the terms of a novation need not be express, but may be implied from circumstances or conduct. *Union Central Life Ins. Co.* v. *Hoyer, supra.* But the evidence of such knowledge and consent must be *clear and definite,* since a novation is never presumed. See *Grant-Holub Co.* v. *Goodman* (1926), 23 Ohio App. 540. As the court of appeals observed in *Livernois* v. *Warner-Lambert, supra,* "one may not accomplish a novation *without negotiating a common understanding* with the other party or parties to an arrangement." (Emphasis added.) *Id.* at 1153.[11]

The *Armstrong* case on which Clevepak relies is readily distinguishable. The employees there received extensive information, at a company meeting, about the impending sale of their division to the new employer. The employees, with full knowledge of the terms of the purchase agreement, chose to accept (con-

tinuing) employment with the new employer. Furthermore, the event triggering the old employer's obligation to pay the Armstrong employees their accrued vacation benefits was stipulated to be "a permanent layoff due to lack of work," much as in the *Livernois* case where "job elimination" was the triggering event. See *Armstrong* v. *Diamond Shamrock Corp., supra,* at 298, fn. 2. Like the *Livernois* court, the *Armstrong* court concluded that since a "layoff," in the usual sense, had not occurred, the old employer's obligation did not yet mature. Finally, and perhaps most importantly, the *Armstrong* court found that the purchase agreement there was "unquestionably * * * a third-party beneficiary contract with * * * [the new employer], under which * * * [the new employer] agreed to satisfy * * * [the old employer's] vacation benefit obligations to these creditor-beneficiary employees." *Id.* at 299.

Here, as regards the letter agreement, there is no evidence of a "common understanding," and there was certainly no consent to its implication that after August 31, 1983, Clevepak was excused from liability for severance pay already accrued. Also, Clevepak's novation theory presupposes that appellants were "parties" to the letter agreement, which they were not. That agreement, by its very terms, was *exclusively* between Clevepak and PRT. Their intent that no one, including the employees, was to be a third-party beneficiary of the transaction is particularly unequivocal. Thus, since appellants were *not* intended to be

---

[11] Cf. *Helle* v. *Landmark, Inc., supra,* at 13:

"[I]f a unilateral contract for severance pay existed, then any contemplated modification would require legally adequate notice to the employees of the proposed change, in addition to the other elements of contract modification."

Other courts have likewise rejected novation arguments by the employer on facts

quite similar to those presently before us. See, *e.g., Mace* v. *Conde Nast Publications, Inc.* (1967), 155 Conn. 680, 237 A. 2d 360, 363 (A novation "requires proof that the one in the position of the creditor, in this case the * * * [employees], had accepted a new debtor * * * in the place of the * * * [predecessor-employer] to which they would look for fulfillment of the severance pay obligation owing to them.").

third-party beneficiaries of the letter agreement, they could not have enforced any right to accrued severance pay against PRT. See *C.A.P.* v. *A. Bentley & Sons* (1975), 45 Ohio App.2d 13, 17-18 [74 O.O.2d 60] (intended beneficiary test). It follows even more strongly that because appellants were not parties to the agreement, its terms are not binding on them and do not affect their severance pay rights accruing prior to August 31, 1983. See *Livernois* v. *Warner-Lambert, supra,* at 1154.

Thus, a "novation" has not been shown here. Indeed, in the final analysis, Clevepak's novation theory is ultimately disingenuous. If accepted on these facts, it would permit the company, through corporate fiat and the limitless fortuities of "special situations," to enter into subsequent agreements retroactively abridging the employees' rights to accrued severance pay and, therefore, to do *indirectly* with a successor-employer that which Clevepak could not do *directly* by breaching its contract with appellants.

## IV

For the foregoing reasons, appellants' assignment of error is well-taken.

On consideration whereof, the judgment of the Erie County Court of Common Pleas is hereby reversed. Pursuant to App. R. 12(B), there being no disputed facts, we now render the judgment which the trial court should have rendered as a matter of law under Civ. R. 56(C), to wit: Clevepak's motion for summary judgment is hereby denied. Appellants' motion for summary judgment is hereby granted. Judgment is hereby entered in favor of appellants and against Clevepak in an amount to be determined on remand.

This case is remanded to said court for computation of damages (severance pay), as herein specified, and for assessment of costs against Clevepak upon final determination of said damages.

*Judgment reversed
and cause remanded.*

DOUGLAS, J., concurs.
RESNICK, J., dissents.

RESNICK, J. I respectfully dissent. I do not believe that summary judgment would have been appropriate for *either party* under these facts, and consequently the trial court was in error in granting Clevepak's motion for summary judgment. However, this case should be remanded for further proceedings on the merits, and thus I must dissent from the majority's entry of judgment under App. R. 12(B).