**Theresa MARYONOVICH, Plaintiff,**

v.

**MARKET DATA RETRIEVAL, INC., MDR Liquidating Corporation, and Herbert Lobsenz, Defendants.**

No. 88 C 47.

United States District Court, N.D. Illinois, E.D.

June 26, 1989.

---

Steven R. Peltin, Robert I. Berger and Brad S. Grayson, Altheimer & Gray, Chicago, Ill., for plaintiff.

J. Kevin McCall and Sandra Zunker Brown, Jenner & Block, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff, a former executive secretary at National Business Lists ("NBL"), brings this action against Market Data Retrieval ("MDR") (NBL's successor), MDR Liquidating Corporation, and its former president. In her complaint plaintiff seeks damages for wrongful denial of severance pay benefits (count I), breach of fiduciary duties (count II) and failure to provide documents in violation of federal law (count III). Federal jurisdiction is predicated on the Employee Retirement Income Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*

Currently before the court are cross-motions for summary judgment on count I and defendants' motion to dismiss counts II and III. For the following reasons, we deny all motions.

## FACTS

NBL and MDR were both in the business of compiling and selling mailing lists. Plaintiff began working for NBL on January 20, 1969, and continued in its employ for approximately 15 years as an executive secretary to NBL's president, Leo Ganz.

In 1984 NBL started down a staggered path to dissolution. MDR's president, Herbert Lobsenz, entered into negotiations for the purchase of NBL, and in June 1984 NBL Acquisition Corporation, a wholly-owned subsidiary of MDR, purchased almost all of NBL's stock. Soon thereafter NBL Acquisitions Corporation and NBL merged. The newly-formed NBL remained a subsidiary of MDR, although it is unclear to what extent it retained a separate existence. For example, at some point after the sale employee paychecks were paid out of MDR's bank account and the business telephones were answered "NBL-MDR," rather than "NBL."

On June 10, 1986, MDR entered into a purchase agreement to sell substantially all of its assets to Dun & Bradstreet ("D & B"). The proceeds from the sale were placed in MDR Liquidating Corporation, which was later converted to its successor, MDR Liquidating Trust.

Plaintiff continued to work as Ganz's secretary for approximately six months after the sale of NBL's stock to MDR. When Ganz ceased working plaintiff worked as an executive secretary for MDR at the same salary, although the parties dispute whether the benefits remained substantially the same (pl. stmt. of mat. facts at 3, n. 2). The parties also dispute whether plaintiff's responsibilities remained the same as they were prior to the sale of NBL to MDR. Plaintiff contends that with

MDR, and certainly later with D & B, she ceased working as an executive secretary for the president of the company and began working for a variety of people in capacities for which she was over-qualified. After the sale to D & B she reported for work at a new address once, merely to protest her new assignment and to see whether she would be placed in a position to her liking. On October 27, 1986, she ceased working because matters had not improved.

Plaintiff subsequently applied for unemployment benefits. A claims adjudicator of the Illinois Department of Labor denied her claim, finding that she had voluntarily quit her job with MDR without cause. This decision was based on written submissions by plaintiff and defendant, and no evidentiary hearing was held. Plaintiff later failed to appear at an appeal of this denial.[1]

NBL had a tradition of providing a number of its valued long-term employees with pensions or severance pay upon termination of their employment. Although there was no written NBL policy on these matters prior to its sale to MDR, Ganz had a practice of rewarding some retiring or departing employees with pensions based upon their length of service and devotion to NBL (Ganz dep. at 71–74). This concern for NBL employees was present during the negotiations for sale of NBL to MDR. Ganz contacted the personnel director at NBL to obtain a list of all employees who had served more than five years (Ganz dep. at 32). After some negotiations with Lobsenz, Ganz inserted into the purchase agreement a provision of rights to a lifetime pension and severance pay for a select

---

1. The parties dispute the extent of process afforded at this determination: defendants contend that plaintiff is barred by collateral estoppel from relitigating the issue of whether she left work voluntarily, and plaintiff argues that the process afforded before the claims adjudicator was insufficient to raise estoppel. Although it is clear that plaintiff never received a real hearing on the issue, her failure to appeal complicates matters.

Ultimately, we find the claims adjudicator's determination immaterial. The issue there was

whether claimant quit voluntarily within the meaning of Illinois' unemployment program; whereas here the issue is whether plaintiff was "terminated" within the meaning of the severance pay policies. We view these as two distinct questions. We believe that it is entirely possible that plaintiff "voluntarily" left D. & B's employment after a change in duties sufficient to constitute a "termination" from her employment as an executive secretary at NBL. Plaintiff is not estopped from pursuing this claim here.

group of NBL employees [2] (Lobsenz dep. at 89).

The severance pay policies provide normal severance pay to anyone employed with NBL for more than two years who is "terminated for normal business reasons." The policies also provide special benefits to three named employees—plaintiff included—if "terminated within five years after date of sale." It provides for normal severance pay plus a "lifetime pension" at "20% of her highest annual salary earned while working for NBL" if she is "terminated for any reason except cause" (cplt., exh. 1). The plan does not further define the term "terminated." [3] Ganz states that he informed his employees of this policy. It is undisputed that MDR did not provide plaintiff with a copy, a summary or any other documents regarding this policy prior to the present litigation.

On April 24, 1987, counsel for plaintiff wrote Lobsenz requesting severance pay pursuant to the policy, asserting that the sale of the company constituted a termination of plaintiff's employment.[4] The letter states, in clear terms, that the law firm represents plaintiff in her claim for benefits; it describes the facts under which she believes she is entitled to payment and requests arrangement for payment.

Defendants' actions after receiving this letter are somewhat confusing. Lobsenz stated in his deposition that MDR had an informal claims procedure, yet it is evident from his testimony that MDR had no claims procedure at all, either initially or for review of claim denials. Indeed, Lobsenz refused to recognize counsel's letter as a claim for severance pay, and when pressed to admit that at some point plaintiff's claim was denied, he refused to take responsibility for the decision. The relevant deposition testimony is too lengthy to reproduce here in its entirety. *See generally* Lobsenz dep. at 74–82. However, some excerpts provide the tenor of Lobsenz's testimony during those proceedings:

Q. Who made the decision on behalf of MDR or MDR Liquidating Corporation whether to provide [plaintiff] with the benefits?

A. Which claim for severance benefits are you talking about?

Q. Well, you received the letter on April 24, 1987; is that right?

A. Right.

---

2. Defendants dispute some of the circumstances leading to the creation of this written severance pay policy. Lobsenz maintains that Ganz wanted "protection" for some employees in contemplation of the possible closing of NBL's Chicago office. However, Ganz repeatedly refused to characterize the policy in this fashion during his deposition testimony. Ganz did explain that he wanted to "make sure that in the event that NBL was, shall I say, dismembered to any extent, employees who had been with us for five years or more ... would receive severance pay and/or pensions. In addition, I wanted special consideration given to some employees who were especially valued" (Ganz depos. at 39). Defendants do not dispute the longstanding tradition of providing benefits to valued, loyal employees.

3. Ganz was repetitively asked at his deposition whether he intended the sale of NBL's stock to MDR to trigger severance pay rights. He responded that it was his understanding that if the employee was terminated from NBL's employment, she was entitled to payment, but that he did not specifically think about whether the sale constituted a termination (Ganz depos. at 128, 137, 139). He further stated that in his opinion, the policy clearly refers to the termination of

employment from NBL, as opposed to any other employer, including MDR (*id.* at 135) and that plaintiff would be entitled to severance pay if Lobsenz had terminated plaintiff from NBL and said: we have a job for you at MDR. Ganz also stated that the termination would have to be a decision made by NBL, and that the policy was not intended to allow for payment upon voluntary departure from NBL (*id.* at 75).

These *post hoc* explanations are not conclusive as to the meaning of "termination" in the policies. If the policies are so ambiguous that they require reference to parol evidence, we would turn first to the objective manifestations of that intent at the time they were drafted and incorporated into the sales agreement.

4. Plaintiff's counsel, the law firm of Altheimer & Gray, also represented NBL to some extent during negotiations for the sale of NBL to MDR. Defendants complain about counsel's conduct in this matter, and claims that prior to the sale, counsel represented to MDR that there was nothing in the purchase agreement that required consideration under ERISA. However, this litigation does not concern any breach of warranty by MBL; whether or not these accusations are true, they are irrelevant for our purposes.

Q. And in that you are requested to provide payment, right?

A. No.

Q. Look at the last paragraph.

A. "Please have your attorney contact the undersigned to arrange for payment." When did [plaintiff] make a claim for severance benefits?

\* \* \* \* \* \*

Q. When you received this letter, you didn't understand what the meaning of "arrange for payment" was?

\* \* \* \* \* \*

Q. Subsequent to this letter did you make a decision or did someone else make a decision to deny the claim that's made in [the letter].

A. Well, is it—I'm not sure I ever understood this letter to be a claim.

Q. Let me step back a minute.... Did you understand ... after reading [the letter] that [plaintiff] wanted money?

A. I understood that she wanted money.

Q. Okay. And you understood, did you not, that she wanted money based upon the attached Severance Pay Policies?

A. Yes.

Q. And you decided or someone decided at some time that she was not entitled to those benefits; is that right?

A. Yes.

Q. Who made that decisionn?

A. It was—I made it, Dun & Bradstreeet made it. It was—we all discussed it. The Illinois Labor Board, really.[5]

After failing to resolve her claim with MDR, plaintiff brought this action to enforce her rights under the severance pay policies.

## DISCUSSION

■ "ERISA was enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans' and 'to protect contractually defined benefits.'" *Firestone Tire and Rubber Co. v. Bruch,* — U.S. ——, 109 S.Ct. 948, 955, 103 L.Ed.2d 80 (1989) (citations omitted). Although defendants argue (in their supplementary memorandum) that NBL's severance plan lies outside the ambit of ERISA, it is clear from almost every case cited herein that severance policies are "employee welfare benefit plans" under ERISA. 29 U.S.C. § 1002(1). Lobsenz was therefore a plan fiduciary, and pursuant to this federal statute he had an obligation "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1).

*Prior Law*

Prior to the Supreme Court decision in Firestone almost every court of appeals construing ERISA employed a deferential standard when reviewing a plan administrator's interpretation of a severance policy—upholding it unless arbitrary or capricious. *E.g., Sly v. P.R. Mallory & Co.,* 712 F.2d 1209 (7th Cir.1983); *Simmons v. Diamond Shamrock Corp.,* 844 F.2d 517 (8th Cir.1988); *Accardi v. Control Data Corp.,* 836 F.2d 126 (2d Cir.1987); *Adcock v. Firestone Tire and Rubber Co.,* 822 F.2d 623 (6th Cir.1987); *Holland v. Burlington Ind., Inc.,* 772 F.2d 1140 (4th Cir.1985), *cert. denied sub nom., Slack v. Burlington Industries, Inc.,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986); *Jung v. FMC Corp.,* 755 F.2d 708 (9th Cir.1985).

These authorities make clear that severance policies are generally instituted to meet two different interests: to tide employees over during a period of unemploy-

---

**5.** Even after this round-about way of responding to counsel's first question, which was relatively clear from the beginning, we are left without an answer. Counsel attempted to explain that he sought the names of the persons involved in the decision to deny plaintiff's claim. While the Illinois Labor Board's determination may have factored into the company's decision, counsel wanted, for the record, a statement that the decision was made by someone of authority in the company. Instead, Mr. Lobsenz continued to deny that a claim was ever made, let alone state who denied it.

ment and to reward them for past services. The first concern is not always present if upon the sale of the company the employee is hired by the company's successor and there is no work interruption. Therefore, courts have in the past upheld the denial of benefits in the sale of business situations when the plan instrument expresses a specific concern for protection against the trauma of unemployment. *See, e.g., Adcock,* 822 F.2d at 627; *Blakeman v. Mead Containers,* 779 F.2d 1146, 1148 (6th Cir. 1985) (plan commits payment of benefits to administrator's discretion and lists ability to secure another job as factor for consideration); *Holland,* 772 F.2d at 1149; *Jung,* 755 F.2d at 713; *Sly,* 712 F.2d at 1211 ("Read as a whole, the [plan] clearly anticipates the recipient of the severance benefits to be without employment"); *Pinto v. Zenith Radio Corp.,* 480 F.Supp. 361, 364 (N.D.Ill.1979) (plan provides for the termination of severance pay, in the discretion of management, if employee is reemployed), *aff'd mem.,* 618 F.2d 110 (7th Cir.1980).[6] Similarly, severance benefit denials have been upheld when the plan expressly excluded payment on the sale of the company if the employee was hired by the successor company in a comparable position. *See, e.g., Young v. Standard Oil (Indiana),* 660 F.Supp. 587, 590 (S.D.Ind.1987), *aff'd,* 849 F.2d 1039 (7th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988).

Courts that employed the deferential "arbitrary or capricious" standard were split when the plan failed to express a specific concern for either the "protection from unemployment" or "reward for past services" purposes. Some upheld the management's interpretation. *See, e.g., Henne v. Allis–Chalmers Corp.,* 660 F.Supp. 1464, 1479 (E.D.Wis.1987) ("plaintiffs ... have provided no evidence supporting their position that severance pay is intended to constitute a "bonus" for past services). However, in *Bennett v. Gill & Duffus Chemicals, Inc.,*

699 F.Supp. 454 (S.D.N.Y.1988), the court declined to find unemployment a prerequisite to benefits. The court there applied the arbitrary and capricious standard, albeit recognizing that *certiorari* had been granted in *Firestone. Bennett* rejected application of the so-called "sale of business" rule and held that the employees were "terminated" after the sale of the company whether or not they were rehired by its successor.

### The New Standard

■ *Firestone,* decided after the initial briefing on the instant cross-motions, rejected mechanical application of the "arbitrary and capricious" standard, finding no basis for it in the strict statutory mandates of ERISA. Instead, the Supreme Court in *Firestone* directed district courts to review fiduciary decisions *de novo* unless the plan instrument expressly empowers the administrator to construe uncertain terms or otherwise mandates a more lenient standard. 109 S.Ct. 956.

For decades prior to the enactment of ERISA severance policy enforcement was relegated to state courts, which reviewed them pursuant to ordinary rules of contract construction. As noted in plaintiff's supplemental briefs, those state courts uniformly held that the sale of the employers business terminates the employee's relationship with that employer, whether or not he or she was rehired by the successor. *See Dahl v. Brunswick Corp.,* 277 Md. 471, 356 A.2d 221, 225 (1976) ("there is ample support ... for the position that when part or all of a company is sold and the employees are told that they cannot remain with their old employer, their employment has been terminated even though they immediately begin to work for the new owner"); *Mace v. Conde Nast Publications, Inc.,* 155 Conn. 680, 237 A.2d 360, 363 (1967) ("There can be no question that, as a result of the licensing agreement with Butterick, the defendant permanently terminated its

---

**6.** Since all these cases were decided under the more lenient standard of review, it is not certain that the result would be the same after *Firestone.* It is entirely possible that an employer's severance policy intends to provide protection against unemployment *and* to reward for-

mer devoted employees. That the policies in these cases expressly referred to protection provided evidence of 'reasonable interpretation' by the employers; yet *de novo* review could warrant a different 'reasonable interpretation.'

employer-employee relationship with the plaintiffs and, at the same time, effected a reduction in its staff. That termination, without more, served to entitle the plaintiffs to severance pay under the terms of their employment contract."); *Willets v. Emhart Manufacturing Co.*, 152 Conn. 487, 208 A.2d 546, 548 (1965) ("There can be no question that the sale of its Mixim division by the defendant involved a permanent release of the plaintiffs. By that sale, the defendant made certain that it could no longer fulfill its part of the employment relationship."); *Matthews v. Minnesota Tribune Co.*, 215 Minn. 369, 10 N.W.2d 230, 232 (1943) ("When an employer disposes of his business, does it operate as a discharge of his employes? The authorities are almost unanimous that it does"); *Gaydos v. White Motor Corp.*, 54 Mich. App. 143, 220 N.W.2d 697, 701 (1974) ("Clearly, the 135 employees were no longer employed by White Motor Corporation and therefore terminated; likewise it was clear that this was so not because of any action on their part") (holding the interpreation of the severance pay contract a jury question); *Chapin v. Fairchild Camera & Instrument Corp.*, 31 Cal.App.3d 192, 197–98, 107 Cal.Rptr. 111, 115 (1st Dist.1973) (citing *Willets* and *Matthews*); *Adams v. Jersey Central Power & Light Co.*, 36 N.J.Super. 53, 114 A.2d 776, 783–84 (Law Div.1955) ("The sale or other termination of an enterprise, no matter for what reason or by what mechanics, ends the employment and severs the relationship of master and servant"), *aff'd*, 21 N.J. 8, 120 A.2d 737 (1956).[7]

Ironically then, the enactment of ERISA—a statute clearly intended to provide protection for employees' rights to pensions and benefits—led at first under the pre-*Firestone* deferential standard to a body of case law which made it easier for management to avoid payment even though state courts would have enforced the employees' rights to those benefits under the

same policies. *See, e.g., Simmons v. Diamond Shamrock Corp.*, 844 F.2d 517 (8th Cir.1988) (upholding the denial of severance benefits to former employees despite prior state court ruling that other similarly situated employees of the same company were entitled). That legal incongruity was rectified by the Supreme Court in *Firestone*, and we now apply a *de novo* standard consistent with the cited state court decisions:

> The trust law *de novo* standard of review is consistent with the judicial interpretation of employee benefit plans prior to the enactment of ERISA. Actions challenging an employer's denial of benefits before enactment of ERISA were governed by principles of contract law. If the plan did not give the employer or administrator discretionary or final authority to construe uncertain terms, the court reviewed the employee's claim as it would have any other contract claim—by looking to the terms of the plan and other manifestations of the parties' intent.

*Firestone*, 109 S.Ct. at 955 (citations omitted).

■ Ultimately the issue presented by this case is whether plaintiff was "terminated" within the meaning of NBL's severance policy, entitling her to benefits. The answer depends upon our gleaning the intent of the drafters by reviewing the objective terms of the policy. Since there are no terms committing the payment decision to the discretion of MDR, we determine *de novo* whether the sale of NBL to MDR, its subsequent sale to D & B, or the reformulation of plaintiff's duties activated plaintiffs' entitlement under the policies. We find genuine disputes over the intent behind the policies and we therefore deny the cross-motions for summary judgment.

The word "terminated" is not itself ambiguous. As the pre-ERISA state court

---

7. *Livernois v. Warner–Lambert Co.*, 723 F.2d 1148, 1152 (4th Cir.1983), a non-ERISA action for payment of severance benefits, distinguishes some of these cases on grounds that there was a substantial change in the nature of employment by the successor company. A careful reading of these cases, however, reveals that the difference in employment was of no legal moment; rather, each cited authority held that the sale of the company itself constituted a "termination" of the employment relationship, as that term was used in the severance pay policies.

decisions make clear, plaintiff's employment was terminated when NBL was sold to MDR and then to D & B. The policies do not condition an employee's termination on the event of unemployment, and to require the loss of work for severance benefits would read more into the meaning of "terminated" than what was there when the policies were drafted.

However, the other terms of the policies are sufficiently inconsistent to present a genuine dispute over the drafters' intent, warranting the denial of plaintiff's cross-motion.[8] Although plaintiff may have been terminated without cause from NBL's employment, it is unclear whether Ganz (in drafting the provision) and Lobsenz (in accepting it) intended this type of termination alone to give rise to a claim for benefits. First, the severance pay policies themselves were part of the sale agreement between NBL and MDR. It would be reasonable for a fact-finder to conclude that the parties did not intend the triggering of the severance plan by the very act of its execution. This position is supported by the prospect that every employee at NBL would have been entitled to normal severance benefits upon the sale, and yet there is no indication that any came forward on such a claim. Second, the severance policies allow for the payment of benefits to plaintiff only if she is terminated within five years of the sale. This five-year window and cap is not entirely consistent with plaintiff's contentions that the plan was triggered by the sale itself and was only to reward past services since an employee terminated by the sale did not need the five-year window and an employee terminated more than five years after the sale would be just as deserving of severance benefits for past service.

Plaintiff is not without evidentiary support indicating an intent to reward past services, as contrasted with an intent to protect against unemployment. NBL's tradition of providing pension and severance pay to its valued employees and the provision of a lifetime pension, payable every month, with no reference to other employment, bolster plaintiff's position. However, these factors simply raise a dispute about an obligation to pay benefits on the initial sale to MDR, and in a similar vein in the later sale to D & B. We must leave to the trier of fact the harmonizing of these inconsistencies and the determination of whether the sale of the business triggers the plan payments.

However, even if defendants can prove that the sale of the business alone is insufficient, plaintiff may still be entitled to judgment on count I if she can prove that the change in her position at MDR and D & B brought her within the coverage of the severance pay policies. We are unsure, as we have said, of the legal effect of the prior Illinois unemployment insurance decision, given the limited nature of the proceeding before the claims adjustor. The issue of whether she left D & B voluntarily does not, however, preclude a finding that the change in her duties amounted to a "termination" within the contemplated meaning of the word. The change in her duties, it would seem, need not rise to the level of constructive discharge to constitute termination in that sense.

Finally, we are troubled by the evidence indicating defendants' failure to provide plaintiff with any documents or summaries concerning her rights under the plan. Would she have stayed on at D & B if she had known the terms of her entitlement? Defendants cannot escape their severance obligations because plaintiff failed to satisfy the plan's terms if they failed to inform her of those severance conditions. This too is a factual question precluding summary judgment.

*Breach of Fiduciary Duty*

In count II plaintiff alleges that Lobsenz, as president and director of MDR and MDR Liquidating Corporation, had fiduciary duties to plan participants and beneficiaries—including the duty to establish, or-

---

**8.** Our job has not been made easier by the person or persons who drafted the severance pay policies. The submissions to this court, not including exhibits, total 140 pages of thoughtful and exhaustive discourse. If the drafters had used as much as one-tenth the care in drafting the "plan" as briefing these motions, we would not have found ourselves in this situation.

ganize, manage and administer the plan solely in their interest. Plaintiff alleges Lobsenz violated his fiduciary duties when he failed to pay her benefits and follow ERISA's requirements. She seeks payment of benefits, interest on withheld benefits, direct, incidental and consequential damages, reasonable attorney fees and costs, and an award of exemplary damages. Count II is redundant with count I except that she also seeks extra-contractual damages. We are therefore asked to decide whether plaintiff can obtain these damages under ERISA.

In *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Supreme Court held that a plan beneficiary was not entitled to an award of extra-contractual damages for breach of fiduciary duty under § 409 of ERISA, 29 U.S.C. § 1109. The text of that provision states that fiduciaries who breach their ERISA-imposed duties are "liable to make good *to such plan* any losses *to the plan* resulting from such breach" (emphasis added). Because Congress provided for payment only to the plan in this section, the Court held that a plan beneficiary could not obtain extra-contractual damages for his or her injury. However, both the Court and the concurrence made clear that the holding was limited to § 1109 and that the determination as to whether extra-contractual damages were available under a different ERISA section was left for another day. *Russell,* 473 U.S. at 139, n. 5, at 157, 105 S.Ct. at 3089, n. 5, at 3098 (Brennan, J., concurring). *See also Pokratz v. Jones Dairy Farm,* 771 F.2d 206, 210 (7th Cir. 1985).

Judge Bua has read *Russell* to mean "damages owed by a fiduciary for breach of duty are payable to the plan, not the beneficiaries" even under § 1132. *Mehl v. Navistar International Corp.,* 670 F.Supp. 239, 242 (N.D.Ill.1987). In so doing the court rejected the reasoning of Judge Barrington Parker in *Foltz v. U.S. News & World Report,* 627 F.Supp. 1143, 1165–67 (D.D.C.1986), who held that *Russell* applied

only to § 1109 and did not preclude actions for breach of fiduciary duty by plan beneficiaries under § 1132. *See also Bartucca v. Katy Industries, Inc.,* 668 F.Supp. 111, 113 (D.Conn.1987). This court has previously held that there was no case law to suggest that punitive damages were possible under § 1132. *See Bradley v. Capital Engineering & Mfg.,* 678 F.Supp. 1330 (N.D.Ill.1988). However, that decision did not constitute a clear finding that such an award is unavailable and we are open to is reconsideration.

■ We are inclined to agree with the views expressed in Foltz and by Justice Brennan concurring in *Russell* that actions for breach of fiduciary duties may be maintained by plan beneficiaries under § 1132. ERISA was intended in large part to incorporate the common law of trusts, *see, e.g., Russell,* 473 U.S. at 152–53, n. 6, 105 S.Ct. at 3096, n. 6 (Brennan, J., concurring); *Central States Pension Fund v. Central Transport, Inc.,* 472 U.S. 559, 570, 105 S.Ct. 2833, 2840, 86 L.Ed.2d 447 (1985). Federal courts must develop the common law of fiduciary obligations under ERISA and we would turn to traditional concepts of trust law espoused by pre-ERISA state court decisions to determine whether plaintiff is entitled to extra-contractual damages under § 1132.[9] We follow these authorities to the extent they are consistent with ERISA's codification of fiduciary obligations and Congress' desire to promote and protect the interest of plan participants and beneficiaries.

The parties here have not addressed what relief plaintiff could have obtained for breach of fiduciary obligations under pre-ERISA state law decisions, whether that amount would be more than count I relief or whether such relief is inconsistent with the concerns of ERISA. *Cf. Kleinhans v. Lisle Savings Profit Sharing Trust,* 810 F.2d 618, 627 (7th Cir.1987) (finding generally that punitive damages are unavailable under traditional trust law). We ask the parties to focus further memoranda on

---

**9.** In reaching this conclusion, we note that it tracks the development of ERISA law after *Firestone,* which looks to pre-ERISA state rules of

contract construction for aid in the interpretation of employee benefit plans.

these issues. Given this holding, we deny defendants' motion to dismiss count II without prejudicing their right to move again after further development of the legal issues.

*Failure to Provide Documents*

In count III plaintiff seeks damages for defendants' alleged violation of 29 U.S.C. § 1024(b)(4). That provision requires plan administrators to furnish, upon request by plan participants or beneficiaries, summary plan descriptions, copies of the plan, annual reports and other information outlining their rights under the plan. To encourage prompt disclosure, ERISA authorizes courts, in their discretion, to impose $100 per day penalties on administrators who refuse to provide requested plan information within 30 days of the request. 29 U.S.C. § 1132(c)(1) (1988 supplement). Plaintiff attaches to her complaint a letter from her attorney dated September 15, 1987, requesting any plan summary, description or any information outlining her severance pay rights. She claims that request remains unanswered. She also attaches a letter from defendants stating that no further information exists relating to her pension rights.

▆ Defendants move to dismiss this count on a number of grounds, none of which warrant dismissal at this stage of litigation. First, they claim claimant was not prejudiced by any refusal to provide plan information. Authorities are split on whether prejudice is a necessary element to claim damages under § 1132(c)(1). *Compare Chambers v. European American Bank and Trust Co.*, 601 F.Supp. 630, 638 (E.D.N.Y.1985) (requiring prejudice, and citing cases constituting the "weight of authority"), *with Porcellini v. Strassheim Printing Co.*, 578 F.Supp. 605, 613–614 (E.D.Penn.1983) (finding prejudice a factor to consider but holding that, due to the punitive purpose behind the provision, it is not required); *Bemis v. Hogue* 635 F.Supp. 1100, 1106 (E.D.Mich.1986) (following *Porcellini*). Although we are inclined to agree with the view espoused in *Porcellini,* we need not resolve the issue since the presence of injury or prejudice to the plain-

tiff is a question of fact that cannot be resolved on a motion to dismiss. Whether prejudice is a necessary element or a fact for consideration in the court's discretion, defendants' assertion must await the development of a factual record, or at least a proper citation to the factual record through a motion for summary judgment.

Defendants' second argument is that plaintiff through whatever means now possesses all the documents now in existence, namely the policy itself. Plaintiff rejoins that defendants had an obligation to compile additional documents, *e.g.*, a plan summary and the other documents specified by ERISA. We are not at all sure what more needs to be done when the plan itself is short and uncomplicated, somewhat in the nature of a summary itself, but here it is ambiguous and the parties do not go much beyond legal assertions. In any event, however, it is an issue which cannot be dealt with on a motion to dismiss—the "plan" is apparently all there is but we cannot assume that for the purposes of the motion. Again, this is not an issue that can be resolved on a motion to dismiss; whether these documents exist is a question of fact on which this court has not heard evidence.

Finally, defendants contend that plaintiff is not entitled to such documents because the severance policies do not constitute a "plan" under ERISA and she is not a colorable claimant under the plain language of the severance pay policy. As stated in *Firestone,* to be a participant under § 1132(c)(1), plaintiff must have a colorable claim that she will prevail in a suit for benefits or that eligibility requirements will be fulfilled in the future. 109 S.Ct. at 958. As our ruling on count I makes clear, both of defendants' claims are without merit. Not only does the severance policy fall within the ambit of ERISA, but plaintiff's claim presents a close factual issue of entitlement.

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment on count I and to dismiss counts II and III is denied.

Plaintiff's cross-motion for summary judgment on count I is also denied.